STATE

v.

Gwen TIMMS.

No. 84–374–C.A.

Supreme Court of Rhode Island.

March 4, 1986.

Arlene Violet, Atty. Gen., Constance Messore, Thomas Dickinson, Sp. Asst. Attys. Gen., for plaintiff.

William F. Reilly, Public Defender, Barbara Hurst, Asst. Public Defender, for defendant.

## OPINION

MURRAY, Justice.

The defendant Gwen Timms appeals from convictions on two counts of driving to endanger, death resulting, in violation of G.L. 1956 (1982 Reenactment) § 31–27–1.[1] The defendant assigns as errors (1) the trial court's admitting into evidence results of a blood-alcohol test given her at Rhode Island Hospital, (2) the trial court's admission into evidence of a piece of wire cord seized from the defendant's vehicle without a warrant three days after the vehicle had been impounded, and (3) the trial court's denial of the defendant's motion to dismiss one of the driving-to-endanger, death-resulting, counts on double-jeopardy grounds.

We affirm the convictions, adverting to each issue separately after a narration of the facts.

On September 13, 1980, at approximately 1:20 a.m., defendant's car crossed over the center line of Elmwood Avenue in Cranston and smashed head-on into a car driven by Janet Palanko. Ms. Palanko and one of the two passengers in her car, fourteen-year-old Barbara Gill, were killed. The other passenger, Ann Spaziano, was seriously injured. The defendant and her passenger, John Ward, were both injured, though not as seriously.

Cranston Police Officer James Brooks, one of the two patrolmen at the scene of the collision, testified as follows. He observed defendant get out of her car. Her clothes were messed up; she was confused, was staggering, and smelled of intoxicating beverages. Her eyes were glassy, and she became combative when rescue personnel

---

1. General Laws 1956 (1982 Reenactment) § 31–27–1 reads:

"(a) When the death of any person ensues as a proximate result of an injury received by the operation of any vehicle in reckless disregard of the safety of others, the person so operating such vehicle shall be guilty of 'driving so as to endanger, resulting in death.'

"(b) Any person charged with the commission of the foregoing shall upon conviction be imprisoned for not more than ten (10) years."

arrived. Officer Brooks suspected defendant of being under the influence of alcohol. The defendant was transported to Rhode Island Hospital. Officer Brooks followed the rescue wagon to the hospital and stayed with defendant as she was placed on a gurney and wheeled into the treatment room. The defendant was awake and alert. Officer Brooks advised her of her *Miranda* rights and told her that she was suspected of driving under the influence. Officer Brooks also read defendant the Cranston police department chemical-test-rights sheet, and requested that she submit to a blood test. He told her that she had the right to refuse the blood test but that if she refused it she would be subject to administrative sanctions. The defendant consented to removal of a blood sample. The attending physician refused Officer Brooks' request that a blood sample be drawn from defendant for chemical analysis because defendant had not signed a release. Officer Brooks then reread to defendant her *Miranda* rights and those on the chemical-test-rights sheet and requested that she sign a standard medical release form.[2] The defendant signed the form and the attending physician then ordered a blood sample drawn and sent to the lab for alcohol-content analysis. The lab test determined defendant's blood-alcohol content to be .15 percent. These results were introduced into evidence over objection by defendant.

Doctor Arthur Burns, the State Medical Examiner, testified that a .15 percent blood-alcohol content would impair most people's motor skills.

John Ward, the passenger in defendant's car, testified that just prior to the collision, the hood on defendant's car began bobbing up and down to such an extent that he could no longer clearly see the road. It appeared that the hood was tied to the front of the car rather than securely fastened. Ward wondered how defendant could see the road, and just after he asked her about it, the crash occurred.

Lieutenant James Gibbs of the Cranston police department testified that after he learned about the hood from Ward he had enlargements of the accident photographs made, which upon examination revealed a piece of material tying the hood to the frame of defendant's automobile. A cord showed up in two photographs. Lieutenant Gibbs then went to the garage where defendant's car had been towed and, without a search warrant, seized an electrical cord which was entangled in and protruding from the smashed radiator of defendant's car. The cord was later introduced into evidence over defendant's objection.

On October 28, 1983, the jury returned guilty verdicts on both counts of driving to endanger, death resulting. The trial court denied both defendant's motion for a new trial and defendant's double-jeopardy objection to sentencing on each offense. The defendant was sentenced on each count to eight years' imprisonment, three years suspended, and five years' probation. The sentences were to run concurrently.

I

### ADMISSION OF THE BLOOD–ALCOHOL TEST

The defendant contends that the results of her blood test performed at Rhode Island Hospital should not have been allowed to be introduced into evidence because that information is protected by G.L. 1956 (1976 Reenactment) chapter 37.3 of title 5, as amended by P.L. 1978, ch. 297, § 1, the Confidentiality of Health Care Information Act (the act). The act provides generally that a patient's confidential health care in-

---

**2.** The release read:
"I, the undersigned, do hereby give permission to Rhode Island Hospital to release to the Cranston Police Department any records, reports or information that pertain to my treatment of injuries received as a victim of a crime or from a traffic accident on September 13, 1980. This information is to be used by the Cranston Police Department for the sole purpose of investigating the crime or accident as well as for court prosecution in any court case resulting from the investigation."

formation cannot be released without the patient's written consent, on a form meeting the requirements specified in the act, unless otherwise authorized by the act or by law. The defendant's contention rests on the fact that the consent form she signed did not meet the exact requirements of the form required for consent under the act.[3] She argues that her consenting to have the information released to the Cranston police department for purposes of investigation and prosecution was therefore invalid.

The confidentiality act § 5–37.3–4(a) provides in part:

"Except as provided in subsection (b) or as otherwise specifically provided by the law, a patient's confidential health care information shall not be released or transferred without the written consent of such patient or his authorized representative, on a consent form meeting the requirements of subsection (d) of this section * * *."

Thus, there are two exceptions under which a patient's confidential information may be released or transferred without the patient's consent: under an exception provided in § 5–37.3–4(b) or where otherwise specifically provided by law. Here, the transfer of defendant's blood-test results to the Cranston police falls under the second exception.

The Legislature had already explicitly provided, in § 31–27–2, for the admissibility of blood-alcohol-content information in driv-

ing-under-the-influence cases.[1] It was clearly the Legislature's intent to have the § 31–27–2 consent requirement apply to the introduction of blood-alcohol-content evidence in cases involving driving under the influence, whether that evidence be derived from blood, breath, or urine samples.

■ It is inconsistent to allow one type of consent to apply to removal of breath or urine samples by police technicians and to require a different, revocable consent to apply to blood samples taken by a healthcare technician. All three types of sample removals constitute the same kind of search-and-seizure activity under the Fourth Amendment to the United States Constitution and under article I, section 6, of the Rhode Island Constitution.[5] This is true whether the removal is of breath at the police station or of blood at the hospital. *See, e.g., Schmerber v. California,* 384 U.S. 757, 767, 86 S.Ct. 1826, 1834, 16 L.Ed.2d 908, 918 (1966); *State v. Berker,* 120 R.I. 849, 856–57, 391 A.2d 107, 111–12 (1978).

We assume the Legislature intended statutes relating to the same subject be construed together to be consistent and to effectuate the policy of the law. *Rhode Island State Police Lodge No. 25 v. State,* 485 A.2d 1245, 1247 (R.I.1984). Statutes *in pari materia* are to be considered harmoniously by this court. *Id.*

■ Although § 31–27–1, under which defendant was convicted, does not explicitly

---

**3.** The defendant argues that the release form she signed, *supra* note 2, was deficient because under G.L. 1956 (1976 Reenactment) § 5–37.3–4(d)(3), as amended by P.L. 1979, ch. 221, § 1, of the act the form was required to include "[a] statement that the consent for release or transfer of information may be withdrawn at any future time and is subject to revocation * * *."

**4.** At the time of defendant's arrest, § 31–27–2 provided in part:
"(a) It shall be unlawful * * * for any person * * * under the influence of any intoxicating liquor * * * to drive * * * any vehicle within this state.
"(b) In any criminal prosecution for a violation of paragraph (a) of this section, evidence

as to the amount of intoxicating liquor * * * in the defendant's blood at the time alleged as shown by a chemical analysis of the defendant's breath, blood or urine or other bodily substance shall be admissible * * * provided * * * that * * * (1) The defendant has consented to the taking of the test upon which said analysis is made * * * ."
This consent provision does not require written consent on a form meeting the exact requirements set forth in the confidentiality act. The present citation of the provision is G.L. 1956 (1982 Reenactment) § 31–27–2(c)(1), as amended by P.L. 1985, ch. 150, § 39.

**5.** *See infra* note 7.

require that the defendant consent to the taking of a blood test before that test may be introduced as evidence in a criminal prosecution, the Legislature must have intended it to include the consent safeguards explicitly provided in § 31–27–2. Both statutes concern the same subject matter, namely driving in a manner so as to threaten public safety. Furthermore, in addition to the already-enacted §§ 31–27–1 and 31–27–2, the Legislature subsequently created § 31–27–2.2, "Driving under the influence of liquor or drugs, resulting in death." The consent safeguards in § 31–27–2.2 are also not explicitly in its text, yet the Legislature would not have enacted two separate driving-under-the-influence sections, intending that the consent safeguards apply only to one. "It follows that if a mechanical application of a statutory definition produces an absurd result or defeats legislative intent, this court will look beyond mere semantics and give effect to the purpose of the act." *State v. Delaurier*, 488 A.2d 688, 694 (R.I.1985). Thus ascertaining the intent of the Legislature, we are duty bound to give effect to that intent. *Id.* at 693.

 As defendant concedes, the trial court found that her consent was voluntary as a matter of fact. The court based this finding, in part, on the testimony of Officer Brooks, who was at the scene of the collision and followed defendant to the hospital. Officer Brooks testified that after having read defendant her *Miranda* rights twice, after having read her the chemical-test-rights sheet twice, and after having advised defendant of her option to refuse the blood test, defendant signed the consent form voluntarily. She appeared to him to be awake, coherent, and capable of understanding everything he had told her. The trial court also found defendant's signature on the consent form to be steady.

That the trial court chose to base its finding on physical evidence and on the testimony of Officer Brooks rather than on defendant's testimony claiming that because of her injuries she was in no condition to consent voluntarily is not clearly erroneous. The court's findings are supported by the record. Findings of fact underlying the issue of voluntariness will not be disturbed on appeal unless clearly erroneous. *State v. Lemon*, 478 A.2d 175, 177 (R.I.1984).

 For purposes of this case, suffice it to say that defendant's signing of the Cranston police department consent form more than adequately complied with the consent requirement in § 31–27–2. And as this court has already decided, proof of intoxication is certainly relevant evidence for a jury to consider in driving-to-endanger, death-resulting trials.[6] *State v. Northup*, 486 A.2d 589, 594–95 (R.I.1985) (citing *State v. Amaral*, 109 R.I. 379, 387, 285 A.2d 783, 787 (1972)).

Lastly, defendant's reliance on *State v. Boss*, 490 A.2d 34 (R.I.1985), for the proposition that blood-test results performed at a hospital in connection with a drunk-driving accident require consent prescribed by § 5–37.3–4(d) of the confidentiality act before they may be released is unfounded. In *Boss* we merely held that under § 5–37.-

**6.** The defendant's contention that the blood test was inadmissible because it was not relevant insofar as the blood sample taken from defendant was originally marked "Unknown White Female # 5," and the state did not offer direct evidence as to how defendant's name came to be stamped on the laboratory report, is without merit. The laboratory technician testified that if an unidentified person is in the emergency room, a number is assigned to him or her and the name of the person is later determined and stamped on relevant reports. The laboratory test report introduced into evidence had defendant's name stamped on it. Further, there was evidence showing defendant arrived at the emergency room at about 1:45 a.m. Blood was taken from her and sent to the laboratory. At 2 a.m. blood from "Unknown White Female # 5" was tested. No other samples from unknown white females were received by the laboratory during that shift. The circumstantial evidence presented by the state to connect the blood-test results it offered with the blood taken from defendant was sufficient for the trial court to allow the weight of the evidence to be considered by the jury. No abuse of discretion is apparent.

3–6(a)(2)(A) the defendant waived his privilege not to have his blood-test results subject to compulsory process when he introduced his physical or mental condition into evidence. 490 A.2d at 36. No such issue is presented here.

The defendant's other contentions as to this issue are without merit.

## II

## SEIZURE OF THE ELECTRICAL CORD

The defendant contends that the wire cord taken from the smashed, front-grill section of her car was unconstitutionally seized and should not have been allowed into evidence.

█ The exclusionary rule protects the individual's reasonable expectation of privacy in his or her person, home, and belongings by prohibiting the use, at trial, of evidence obtained by illegal searches and seizures in violation of a person's constitutional rights.[7] *State v. Burns*, 431 A.2d 1199, 1205 (R.I.1981).

█ It follows that when no reasonable privacy interest has been unlawfully invaded, neither the Fourth Amendment to the United States Constitution nor article I, section 6, of the Rhode Island Constitution prevents the introduction of evidence seized. *See State v. McKee*, 442 A.2d 440, 442–43 (R.I.1982).

█ In *State v. Benoit*, 417 A.2d 895 (R.I.1980), we held that the defendants' privacy interest in items in the passenger compartment of the car was paramount over the state's interest in searching the car and seizing those items because, although police had lawfully seized the car itself some four hours earlier, they should have procured a warrant before making an additional invasion into the defendants' privacy interest in the interior of the car, even if the items seized were in plain view insofar as they could be seen through the car's windows. *Id.* at 901. Unlike *Benoit*, in the instant case no additional privacy interest has been invaded. Taking a wire attached to the outside, front-grill area of an automobile already lawfully seized, when that wire is in plain view for all to see and when no additional privacy intrusion (such as entering the passenger compartment of the vehicle) is needed to remove the wire, constitutes neither an unlawful search nor a further seizure.[8]

The situation here is analogous to one where police, having already lawfully seized a car, scrape mud from the tires to

---

**7.** The Fourth Amendment to the United States Constitution provides:

"The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

Article I, section 6, of the Rhode Island Constitution provides:

"The right of the people to be secure in their persons, papers and possessions, against unreasonable searches and seizures, shall not be violated; and no warrant shall issue, but on complaint in writing, upon probable cause, supported by oath or affirmation, and describing as nearly as may be, the place to be searched, and the persons or things to be seized."

The federal exclusionary rule is a product of the United States Supreme Court's making the protections of the Fourth Amendment applicable to the states through the Fourteenth Amendment in *Mapp v. Ohio*, 367 U.S. 643, 655, 81 S.Ct. 1684, 1691, 6 L.Ed.2d 1081, 1090 (1961). The Rhode Island exclusionary rule is embodied in G.L. 1956 (1985 Reenactment) § 9–19–25:

"In the trial of any action in any court of this state, no evidence shall be admissible where the same shall have been procured by, through or in consequence of any illegal search and seizure as prohibited in section 6 of article I of the constitution of the state of Rhode Island."

Article I, section 6, of the Rhode Island Constitution thus protects the individual's rights, through § 9–19–25, in the same way as does the Fourth Amendment exclusionary rule. *State v. Davis*, 105 R.I. 247, 252, 251 A.2d 394, 397 (1969).

**8.** The defendant does not contend that the automobile itself was unlawfully seized. It was not. Removing a smashed vehicle from the middle of the highway after a fatal accident can hardly be said to be an unlawful police impoundment.

use it as evidence. One would be hard pressed to argue in that instance that the police had made an "additional" seizure, namely, that of the mud. *See Cardwell v. Lewis*, 417 U.S. 583, 591, 94 S.Ct. 2464, 2470, 41 L.Ed.2d 325, 335 (1974) (plurality opinion).

A different situation arises once police invade a separate privacy interest, such as an individual might reasonably have in items inside his or her car, trunk, or glove compartment. In *Benoit* police removed items from the interior of the defendants' car. That activity required the officers (1) to open the car doors, thereby invading any privacy interest in the car's interior, (2) to conduct a *search* of the passenger compartments, and (3) to make additional and separate seizures of the items found therein. Here there was no such Fourth Amendment or section 6 activity.[9] A car is seized but once.

### III

### DOUBLE JEOPARDY

The final issue on appeal is whether, as defendant contends, her constitutional right not to be placed twice in jeopardy[10] was violated by her being convicted and sentenced on two counts of driving to endanger, death resulting, for one accident.

 In determining whether a defendant is being punished twice for the same act, in violation of his constitutional rights, "the test has traditionally been whether each offense requires proof of a fact that the other does not." *State v. Lemon*, 497 A.2d 713, 719 (R.I.1985) (citing *Blockburger v. United States*, 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932)). The *Blockbur-*

*ger* test applies to challenges under either the State or Federal Constitution. *See State v. Davis*, 120 R.I. 82, 86, 384 A.2d 1061, 1064 (1978).

 Here, the defendant was charged with two counts of driving to endanger, death resulting. For one count, the prosecution proved beyond a reasonable doubt that the death resulting from the defendant's dangerous driving was that of Janet Palanko. For the other count, the prosecution proved beyond a reasonable doubt that the death resulting from the defendant's dangerous driving was that of Barbara Gill. Thus, on each count two separate and distinct facts were proved, the basic element of "death resulting" being proven by the separate deaths of two individuals. Under the *Blockburger* test, the defendant's constitutional guarantees not to be placed twice in jeopardy were not violated. *Id.*

Premised on the above reasoning and authorities, the defendant's appeal is denied and dismissed, the judgment of trial court is affirmed, and the papers in the case are remanded to the Superior Court.

---

9. That the officer may have had to reach a few inches under the hood to remove the wire from the mangled radiator is not of constitutional import. The difficulty in removing the wire arose from the fact that the accident had caused the radiator to be smashed back into the engine compartment, beneath the hood.

10. Though it was not explicit in her brief, presumably defendant contends she is protected both by the double-jeopardy provision of the

Fifth Amendment to the United States Constitution, which provides in part:

"No person shall be * * * subject for the same offense to be twice put in jeopardy of life or limb * * *,"

and by that of article XL, section 1, of the Rhode Island Constitution, which provides in part:

"No person shall be subject for the same offense to be twice put in jeopardy."