STATE

v.

Michael BRENNAN.

No. 86–99–C.A.

Supreme Court of Rhode Island.

June 3, 1987.

James E. O'Neil, Atty. Gen., Thomas Dickinson, Asst. Atty. Gen., Providence, for plaintiff.

John A. MacFayden, 3rd, Providence, for defendant.

## OPINION

MURRAY, Justice.

The defendant was convicted of felony murder and appeals. We affirm.

Detectives responding to a call to investigate a homicide at an apartment at 17 Deborah Street in Providence on the morning of January 18, 1984, found the body of eighty-one-year-old Lawrence Bello on the floor. Mr. Bello had been beaten, battered, tortured, and murdered. A pipe had been stuffed down his throat; its bowl protruded from his lips. A bloody knife and a roll of twine lay next to Mr. Bello's body; the word "kill" had been written in what appeared to be blood on the wall. The entire apartment had been ransacked; a table was tipped over, drawers lay empty on the floor, the mattress had been turned upside down, holes had been punched in the wall. There were no signs of forced entry, however—no pried locks, broken doors or broken windows. Detectives speculated that robbery had been the motive and that Mr. Bello may have known the perpetrator(s).

An autopsy revealed that Mr. Bello had sustained numerous contusions, cuts and abrasions about the face, a split lip and a fractured nose. His eyes were black and swollen. There were several parallel, shallow incisional wounds running across Mr. Bello's neck which, in the state medical examiner's opinion, had been carefully drawn. Mr. Bello's chest was collapsed; it had been crushed in. All the ribs were broken. There were very deep stab wounds in the center of his neck, chest and stomach. Bruising of the front neck muscle and a fractured hyoid bone indicated manual strangulation.

There were no eyewitnesses to the murder, but relying on an accumulation of circumstantial evidence, police arrested defendant, Michael Brennan, and his brother, Thomas Brennan, both of whom lived with their mother in the apartment just behind Mr. Bello's. The brothers were tried separately.

Based on circumstantial evidence, along with evidence of incriminating statements defendant had made to several persons (including Raymond Furtado and Edward Peckham, two inmates at the Adult Correctional Institutions) after the murder, a jury convicted defendant of felony murder, with robbery as the underlying felony.

## I

### DEFENDANT'S ARREST

The defendant first contends that statements and other evidence derived from his arrest should not have been admitted into evidence because the police did not have probable cause to arrest him.

The central concern of the Fourth Amendment to the United States Constitution is to protect the liberty and privacy interests of individuals from the arbitrary and oppressive interference of government officials. *United States v. Ortiz*, 422 U.S. 891, 895, 95 S.Ct. 2585, 2588, 45 L.Ed.2d 623, 628 (1975). The Rhode Island Constitution offers similar protection to those in Rhode Island through article I, section 6.

*State v. Timms,* 505 A.2d 1132, 1137 n. 7 (R.I. 1986). Both Constitutions protect against "unreasonable searches and seizures." *Id.*

The federal exclusionary rule, which prohibits the introduction at trial of evidence seized in violation of a person's constitutional rights, "was fashioned as a sanction to redress and deter overreaching governmental conduct prohibited by the Fourth Amendment." *Davis v. Mississippi,* 394 U.S. 721, 724, 89 S.Ct. 1394, 1396, 22 L.Ed.2d 676, 679 (1966). This exclusionary rule, which was made applicable to the states in *Mapp v. Ohio,* 367 U.S. 643, 655, 81 S.Ct. 1684, 1691, 6 L.Ed.2d 1081, 1090 (1961), as one of the due-process protections contained in the Fourteenth Amendment, is buttressed by Rhode Island's statutory exclusionary rule, G.L. 1956 (1985 Reenactment) § 9-19-25. *Timms, supra.* These rules, which both bar the introduction of fruits of an unlawful arrest, *see Wong Sun v. United States,* 371 U.S. 471, 484, 83 S.Ct. 407, 416, 9 L.Ed.2d 441, 453 (1963); *State v. Eddy,* 519 A.2d 1137, 1141 (R.I. 1987), effectively deter the police from "subject[ing] unlimited numbers of innocent persons to the harassment and ignominy incident to involuntary detention." *Davis v. Mississippi,* 394 U.S. at 726, 89 S.Ct. at 1397, 22 L.Ed.2d at 680-81.

■ Police officers, of course, may legally arrest a suspect without a warrant if they have probable cause to believe the suspect has committed an offense. *State v. Belcourt,* 425 A.2d 1224, 1226 (R.I. 1981), *cert. denied,* 454 U.S. 842, 102 S.Ct. 154, 70 L.Ed.2d 127 (1981). The requirement of probable cause is what makes the arrest a "reasonable" seizure under the State and Federal Constitutions. Probable cause to arrest exists if, at the time of the arrest, the arresting officer had knowledge of facts and circumstances, based on reasonable and trustworthy information, sufficient to cause a prudent officer to believe that the suspect had committed or was committing a crime. *State v. Pacheco,* 481 A.2d 1009, 1022 (R.I. 1984); *Belcourt,* 425 A.2d at 1226. "[P]robable cause is a fluid concept—turning on the assessment of probabilities in particular factual contexts." *Illinois v. Gates,* 462 U.S. 213, 232, 103 S.Ct. 2317, 2329, 76 L.Ed.2d 527, 544 (1983).

■ In reviewing a claim of illegal arrest we independently examine the record to determine whether the "mosaic of facts and circumstances" on which the arresting officer relied in arresting the defendant— viewed cumulatively through the eyes of a reasonable, cautious police officer guided by his or her experience and training—established probable cause. *Pacheco,* 481 A.2d at 1022. This "mosaic" may reflect the collective knowledge of the police department, as long as the arresting officer relied on that knowledge. *Id.*

■ At the suppression hearing Providence Police Detective Henry P. Roy testified that at about 7 a.m. on Wednesday, January 18, 1984, he went to an apartment at 17 Deborah Street where he observed the bruised and battered victim lying dead on the floor, a bloody knife lying nearby, and the word "kill" written in a dark, dry substance on the wall. Although the apartment had been ransacked, there were no signs of a breaking and entering.

Detective Donald A. Alberico testified that he was also at the murder scene that morning and that it was brought to his attention that Thomas and Michael Brennan resided at 19 Deborah Street, which was at the end of the driveway of 17 Deborah Street. He went to 19 Deborah Street, where he spoke with defendant's mother. Mrs. Brennan told Detective Alberico that she hadn't seen her two sons since the previous morning and that it was unusual for the boys not to have come home. She also told the detective that she had given Thomas $1.40 bus fare the previous morning so that he could go see his parole officer, and that two weeks earlier Thomas had stayed a couple of days at the house of a girlfriend who Mrs. Brennan knew only as Marguerite. The detective also learned that both Brennan boys had been present when, four days earlier, Mr. Bello (who was Mrs. Brennan's landlord) had a disagreement with Mrs. Brennan over some money that she owed him.

Darlene Alemida, who lived in the apartment below Mrs. Brennan's, told Detective Alberico that the Brennan boys were creatures of the night who had tried to gain entrance to her apartment at two o'clock one morning. She also told the detective it was common neighborhood knowledge that Mr. Bello, who owned several nearby apartments and preferred to be paid rent in cash, kept quantities of money in his house.

The investigation of the crime scene revealed the probable motive as robbery, and the association between the Brennan family and Mr. Bello indicated to Detective Alberico that the Brennan boys were probably familiar with the fact that Mr. Bello collected rents and, on certain days of the month, would have cash on hand. Mr. Bello had also told a tenant the day before he was killed that he was quite concerned about the fact that Mrs. Brennan was behind in her rent and utility bills and also that although he had originally rented the apartment to Mrs. Brennan and her daughter, the Brennan boys and another man were now living there. The tenant suggested to Mr. Bello that he begin eviction proceedings.

Detective Alberico learned from the medical examiner that Mr. Bello had died between 2 and 4 a.m. The detective also found, by checking with the Bureau of Criminal Identification, that Michael Brennan had outstanding arrest warrants issued by the Department of Natural Resources and by the Warwick police department. He also learned that both brothers were convicted felons with extensive criminal records, that both had been arrested for robbery in the past, and that Thomas had previously been charged with murder and convicted of manslaughter. The detective learned from several informants that Marguerite's last name was Napolitano, and from an arrest book that her last known residence was 1400 Douglas Avenue, North Providence. One informant said that if Thomas Brennan were "on the run," he would go to Napolitano. North Providence police told Detective Alberico that Napolitano had an outstanding bench warrant against her for shoplifting.

Detective Steven H. Hall, who assisted Detective Alberico in his investigation, testified that on Thursday, January 18, he and Detective Alberico spoke to witnesses in a downtown bar called the Safari Lounge. John Clarke, a Safari patron who later testified at defendant's trial, told the detectives that he had seen the Brennan brothers in the Safari Tuesday, just before the homicide, and had seen Michael Brennan there on Wednesday, just after the homicide. Clarke told the detectives that on Tuesday Michael had no money but that on Wednesday he appeared nervous and was spreading a lot of money around. Michael had told Clarke about "making a score," and Clarke told Detectives Hall and Alberico that the Brennans were "the people [they] were looking for." He also told them that he believed the Brennans were staying with a Marguerite on Douglas Avenue.

The detectives spoke with the Safari's owner and several other patrons who confirmed that Michael had been at the bar on Wednesday spreading money around, which was unusual. One patron said that at one point Michael put his head down in his hands on the bar and said, "I'll never see my daughter again."

Armed with all this information, Detectives Hall and Alberico and other Providence detectives accompanied North Providence police (who had a warrant to arrest Napolitano) to 1400 Douglas Avenue on January 19. The officers knocked on the door and were allowed entry by one of the occupants. The North Providence police arrested Napolitano, while the Providence detectives arrested Thomas Brennan, who Detective Alberico observed had bruises on his neck and knuckles, and Michael Brennan, who Alberico observed had a large bruise on one of his elbows.

We believe that on this record the trial justice was justified in finding that the Providence police had probable cause to arrest Michael and Thomas Brennan. Not only were the officers certain that a horrible homicide had been committed, the particular factual context presented above reasonably led the officers to believe there

existed a strong probability that the Brennan brothers were involved in Mr. Bello's death. Detectives had gathered as much evidence as they could; there were no eyewitnesses to the murder. The totality of the circumstantial evidence they had amassed pointed to motive, opportunity, and flight on the Brennans part. All this evidence, combined with the brothers' criminal records and Michael's admissions to patrons in the Safari lounge, provided the officers with probable cause to arrest the Brennans.

But defendant contends that there is another reason fruits derived from his arrest should be suppressed: his arrest was illegal because he was arrested without a warrant in a dwelling house. The defendant, however, failed to properly raise this issue below,[1] and thus we will not consider it on appeal. *State v. DeWitt*, 423 A.2d 828, 830 (R.I. 1980).

## II

### EVIDENCE CONCERNING ALBERT SIONNI

■ Independent of the Brennan brothers' arrests the police had arrested Albert Sionni as a suspect in the Bello murder. Sionni lived above Mr. Bello and apparently had been in an altercation with him a month before the murder. After questioning Sionni and performing tests on some of his belongings, however, the police were satisfied that he had nothing to do with the murder and he was eliminated as a suspect.

On April 9, 1985, prior to defendant's trial, defendant's counsel moved to have "any information that the police have as to [Sionni] turned over to myself and [counsel for Thomas Brennan]." The trial justice granted this discovery motion and issued a written order which was filed May 1, 1985, requiring the state to "furnish any written

statements and real evidence it has in its possession concerning Albert Sionni."

At a pretrial hearing on May 7 defendant's counsel expressed to the trial justice his dissatisfaction with what the state had produced on Sionni, then moved for more discovery:

"I would move, and I thought I had moved—I hopefully am more explicit at this point—that what I am looking for is whatever information they have, be this written statements or oral statements, and whatever evidence they did gather with regard to Albert [Sionni]."

Counsel for the state responded by assuring the justice that the state had fully complied with the justice's prior order by turning over all written statements and real evidence concerning Sionni that it had in its possession and argued that it would be unwarranted and burdensome for the police officers involved in the Sionni investigation to have to create written reports based on their memory of any oral statements made during the investigation. Satisfied that the state had complied with his earlier order, the justice denied the defense motion for further discovery, noting that the state would be compelled to produce any exculpatory information it possessed even in the absence of an order. The justice also asked the state to file a statement to the effect that it had complied with his earlier order, which the state did.

On appeal defendant asserts that the justice erred in not requiring the prosecution to turn over something more regarding Sionni. We disagree.

Although due-process concerns require a prosecutor to turn over to the defense any exculpatory evidence material to the pending trial, *Brady v. Maryland*, 373 U.S. 83, 87, 83 S.Ct. 1194, 1196–97, 10 L.Ed.2d 215, 218 (1963), they do not "extend an open

---

1. Nowhere in the record do we find any motion to suppress statements derived from defendant's arrest in a dwelling house in which police had not obtained consent to enter from any of the residents. There was no memorandum of law on this issue filed below, and it was not argued before the trial justice at the suppression hearing. Since defendant never brought the issue of the warrantless arrest in a dwelling house to the attention of the trial justice at the hearing, the justice did not make any findings of fact as to who let the officers into the residence at 1400 Douglas Avenue, as to whether the entry was consensual, or as to whether the arrest was validly made with a warrant.

invitation to criminal defendants to comb prosecution files for any or all information that might be remotely useful." *State v. Wyche*, 518 A.2d 907, 908 (R.I. 1986). Further, the state is not responsible for the delivery of evidence outside its custody or control. *Id.* at 909. Since defendant has made no showing whatsoever that the state withheld any exculpatory evidence under its custody or control, and since Rhode Island's discovery rule, Rule 16 of the Superior Court Rules of Criminial Procedure, does not require the prosecution to provide to the defense any more discovery than it had already provided, the trial justice did not err in denying defendant's motion for further discovery on the Sionni investigation.

The defendant also contends that the trial justice impermissibly limited the scope of defendant's cross-examination of several witnesses in regard to the activities of Sionni.

■ Effective cross-examination is federally guaranteed by the due process clause of the Fourteenth Amendment, which incorporates the Sixth Amendment confrontation clause, *Pointer v. Texas*, 380 U.S. 400, 406, 85 S.Ct. 1065, 1069, 13 L.Ed.2d 923, 928 (1965), and is also secured by the confrontation and assistance-of-counsel clauses of article I, section 10 of our State Constitution. This basic right provides the principal means by which the credibility, veracity, perception, and recollection of a witness may be tested. Thus, a criminal defendant is not only entitled to pursue on cross-examination matters brought out on direct, he or she must also be afforded a reasonable opportunity to reveal or establish any possible bias, prejudice, or ulterior motive underlying a witness's testimony, as well as any inability of the witness to accurately perceive, recollect, or communicate events, or to appreciate the necessity of telling the truth.

■ The scope of cross-examination is not unlimited, however. Its scope is subject to the sound discretion of the trial justice. Hence, questions that are irrelevant or that offer no probative value may be limited. *State v. Anthony*, 422 A.2d

921, 924 (R.I. 1980). And where a defendant seeks in cross-examination to open up new avenues of inquiry concerning the possible motive of a third party to commit the crime of which the defendant is accused, the trial justice may properly exclude such evidence as a collateral matter—absent an offer of proof by the defendant "tending to show the third person's opportunity to commit the crime and a proximate connection between that person and the actual commission of the crime." *State v. Gazerro*, 420 A.2d 816, 825 (R.I. 1980).

■ Because defendant in this case failed to make an offer of proof or to introduce any evidence tending to show that Sionni could have committed the murder of Mr. Bello, the trial justice did not abuse his discretion in denying defendant the opportunity to cross-examine witnesses as to the collateral matter of Sionni's activities.

### III

### THE EXPERT TESTIMONY

■ At trial an agent of the Federal Bureau of Investigation (FBI) testified as an expert in hair analysis. The agent testified over defense objection that, based on his microscopic comparison of defendant's hairs with those found at the scene of the murder, the hairs found at the scene "could have" belonged to defendant. The agent based his conclusion on the fact that the fifteen or twenty individual characterics present in defendant's hairs matched exactly those characteristics present in the hairs found at the scene. The agent also stated it was "possible" that the hairs found at the scene "could have originated from another individual." The agent was fully cross-examined on this issue, and defendant presented his own hair-analysis expert in rebuttal.

The defendant asserts on appeal that although the agent's testimony "may have been probative," it was inadmissible because the agent's conclusion that the murder-scene hair "could have" come from defendant did not provide an identification of

defendant to a degree of "reasonable scientific certainty."

Despite the fact that neither the defense nor the prosecution cited *State v. Vargus*, 118 R.I. 113, 373 A.2d 150 (1977), to the trial justice below or to this court on appeal, we already decided this precise issue in that case. In *Vargus* an FBI agent testifying as a hair-analysis expert for the prosecution stated that hair found at the scene of the robbery "could have" originated from the defendant. *Id.* at 118–19, 373 A.2d at 153. We held that such expert testimony, though not providing identification to a "scientific certainty," was nevertheless admissible. *Id.* at 126–27, 373 A.2d at 156–57. "The degree of conclusiveness which characterizes the testimony of a witness, properly qualified to give his [or her] opinion as an expert, goes only to the weight and not the admissibility of evidence." *Id.* at 127, 373 A.2d at 157.

Hence, it was not error for the trial justice in this case to allow the FBI agent's testimony.

For these reasons, the defendant's appeal is denied and dismissed, the conviction appealed from is affirmed, and the papers are remanded to the Superior Court.