**STATE,**

v.

**John CHIELLINI.**

No. 88–83–C.A.

Supreme Court of Rhode Island.

April 24, 1989.

James E. O'Neil, Atty. Gen., Mary E. Rogers, Nicholas Trott Long, Asst. Atty. Gens., for plaintiff.

Catherine A. Gibran, Barbara Hurst, Asst. Public Defenders, for defendant.

## OPINION

MURRAY, Justice.

On July 9, 1985, a corpse was discovered lying face down in the tall grass of Merino Park in Providence, Rhode Island. Clad only in socks and sneakers, the woman's scarred body was heavily infested with maggots. The deceased was fifty-four-year-old Verna Mester. She had been stabbed over ninety times about the face, neck, chest, abdomen, legs, and arms. Two days in the July heat had badly decomposed the body.

Arthur C. Burns, former deputy chief medical examiner, performed an autopsy on Mester's remains. Although most of the wounds were superficial and individually would not have been life threatening, Dr. Burns concluded that Mester had bled to death. The medical examiner could determine neither the precise depth of the wounds nor the type of knife or blade used to kill Mester because of extensive decomposition. For this same reason, Dr. Burns also did not test for evidence of sexual activity or abuse.

Friends last saw Verna Mester alive on July 6, 1985. On that fateful night Mester and her live-in boyfriend of two years, Gilbert Jackman, visited a tavern known as Bobby's Lounge on Manton Avenue in Providence. The defendant, John Chiellini (Chiellini), was present in the barroom that evening. Jackman departed for home while Mester remained behind to converse with her friends Emily, Cindy, and Peggy. Chiellini left the bar at 11 p.m. At approximately ten minutes before midnight Mester and her companion Emily emerged from the tavern. The two women talked briefly on the street corner before going their separate ways. As Emily turned to walk from Bobby's Lounge to the Wedgewood, a tavern owned by defendant's in-laws, she cautioned Mester about venturing alone down a darkened and deserted Delaine Street. Mester had been drinking heavily that night and smoking generic-brand cigarettes.

At approximately 12:15 a.m. Doris Conklin (Mrs. Conklin), defendant's mother-in-law, was standing in front of the Wedgewood Tavern to catch a breath of fresh air when she saw Chiellini drive by in her daughter's car. The defendant was alone, and the vehicle appeared to be in fine condition at that time. The car accelerated by Mrs. Conklin, turned around in a gas station lot, and circled back past the Wedgewood within the span of a few minutes. Chiellini had taken the car earlier that evening, leaving his wife and children at home.

When defendant returned home at four o'clock in the morning, he woke his wife, Doris Chiellini (Doris), and told her that another vehicle had slammed into their car at 11 p.m. in front of the Wedgewood Tavern. The next morning Doris examined the car and discovered that "[i]t had a

smashed grill. The license plate was on my kitchen table. There was a pack of no-name cigarettes on the front floor. There was flowers from the woods in the driver's door * * * and a blue jacket on the back seat." She further noticed that the taillights were damaged. Later that day defendant cleaned the interior and exterior of the car thoroughly. Doris thought this rather unusual. Doris also found the terry-cloth shirt which Chiellini had worn the night before crumpled on a pile of dirty clothes in the laundry basket. The shirt was covered with blood. When Doris asked her husband what had happened to his shirt, defendant explained that he had cut his finger while working on their vehicle's carburetor. Chiellini also borrowed a police scanner from his sister that day and listened to it constantly.

Concerned, Doris told her mother about the incident. After learning that a body had been discovered in Merino Park, Mrs. Conklin telephoned the Providence police department. She informed the police about defendant's blood-soaked shirt and the fictitious automobile accident. Mrs. Conklin also told the police the location of her daughter's car.

On July 10, 1985, Detective James Higgins located the car on Marvin Street in the Olneyville section of Providence. Upon noticing the broken taillight, Higgins recalled that while investigating the crime scene on the previous day, he had observed fragments of a taillight lens in close proximity to the body. Detective Higgins then returned to Merino Park and retrieved this evidence. Small pieces of chromeplated plastic were also discovered in the vicinity of the body by the Bureau of Criminal Investigation.

Detective James Ronald Wilson had the car towed to the police impoundment lot on orders from headquarters. When Doris noticed the car missing shortly thereafter, she reported it stolen. At that point Detective Wilson asked her to come to the station house for questioning. While at the station Doris gave the police permission to search both her car and her home. Despite having her written consent, the police ob-

tained warrants before searching either the automobile or the house. The police inventoried the car first and seized numerous items including pieces of the damaged taillight assembly and the front grille. Doris next accompanied the police to her house for a full-scale search. Among other things seized from the Chiellinis' home were defendant's shirt and trousers, a penknife, and a package of generic cigarettes.

On November 22, 1985, a grand jury returned an indictment against Chiellini, charging him with the murder of Verna Mester. At trial John Henry Jackson, a resident of a high-rise-apartment complex overlooking Merino Park, testified that in the early morning hours of July 7, 1985, he heard engines racing and tires squealing on the street below. He peered outside his window and saw a van attempting to free a lightcolored brown car that appeared to be stuck on a rubbish pile in the park. Jackson stated that the van initially pushed the automobile from the rear. When the car's left taillight broke, the van then pushed from the front. The two men operating the vehicles finally extricated the car after half an hour's effort. Later at the police garage, Jackson identified Chiellini's car as the vehicle he had seen that morning. Doris had testified that defendant's brother had access to a van.

The state called three expert witnesses on its behalf. David Nichols, a Federal Bureau of Investigation (FBI) agent specializing in plastics analysis, testified that he had examined the pieces of the taillight lens at the request of the Providence police department. His examination revealed that the lens fragments found at the park belonged to Chiellini's vehicle. Nichols also testified that the pieces of plastic discovered near the crime scene had broken off the front grille of Chiellini's automobile.

The chief forensic serologist of the FBI Crime Laboratory, William Eubanks, testified that he had examined blood samples from both Verna Mester and defendant. Because Mester's blood had deteriorated so badly, Eubanks could only obtain an en-

zyme grouping for it. Relying on the results of this enzyme analysis, Eubanks determined that the blood stains on Chiellini's shirt were consistent with the blood type of Verna Mester. He further elaborated that only 7 percent of the Caucasian population has that particular blood-enzyme grouping. Eubanks concluded that the blood on the shirt was not Chiellini's.

Peter R. DeForest, an expert in criminalistics, testified that he had examined the blood stains on defendant's shirt. DeForest stated that these stains were in a "spatter pattern." Such a pattern, DeForest noted, is consistent with stabbing or bludgeoning. DeForest also found a denser distribution of bloodstains near Chiellini's leftfront pocket, suggesting that the distance from the left side of the shirt to the source of blood was shorter than other areas of the garment. Doris had testified earlier that defendant was left-handed.

This trial concluded after ten days with the record comprising two volumes of 582 pages. The jury returned a guilty verdict against Chiellini for second degree murder. The trial justice denied defendant's motion for a new trial and sentenced him to life imprisonment. Chiellini raises three arguments on appeal. We shall address defendant's contentions in the order in which they appear in his brief.

## I

▮ The first argument raised by defendant addresses prosecutorial misconduct. The defendant claims that the prosecutor, through Detective James Wilson, intentionally or recklessly misled the grand jury by exaggerating or fabricating incriminating evidence against him. Such blatant and flagrant prosecutorial malfeasance, Chiellini argues, impaired the integrity of the grand-jury process and violated his federal and state constitutional rights.[1] Despite

having been found guilty beyond a reasonable doubt of murdering Mester, defendant urges this court to dismiss the indictment brought against him. This we decline to do.

▮ The burden of establishing that prosecutorial improprieties or irregularities before the grand jury were of such a flagrant and overbearing nature as to justify dismissal of an indictment is a heavy one, particularly after a petit jury has found a defendant guilty beyond a reasonable doubt of the charges contained therein. The United States Supreme Court, as well as this court, has recently stated that dismissal of an indictment based upon an alleged nonconstitutional error is appropriate only " 'if it is established that the violation substantially influenced the grand jury's decision to indict,' or if there is 'grave doubt' that the decision to indict was free from the substantial influence of such violations." *Bank of Nova Scotia v. United States,* — U.S. —, —, 108 S.Ct. 2369, 2374, 101 L.Ed.2d 228, 238 (1988) (quoting *United States v. Mechanik,* 475 U.S. 66, 78, 106 S.Ct. 938, 945–46, 89 L.Ed.2d 50, 60–61 (1986) (O'Connor, J., concurring)). *See State v. Mainelli,* 543 A.2d 1311, 1314 (R.I.1988). We therefore reserve the extraordinary sanction of dismissing an indictment because of prosecutorial misconduct for very limited and extreme circumstances. *State v. Chakouian,* 537 A.2d 409, 413 (R.I.1988); *State v. Wilshire,* 509 A.2d 444, 448 (R.I.1986), *cert. denied,* 479 U.S. 1037, 107 S.Ct. 891, 93 L.Ed.2d 843 (1987); *State v. Manocchio,* 497 A.2d 1, 12 (R.I.1985). We have repeatedly stated that, notwithstanding a defendant's allegations of impropriety, a trial justice can properly order a trial on the merits when a legally constituted grand jury returns an indictment. *State v. Wilshire,* 509 A.2d at 448 (citing *Costello v. United States,* 350

---

1. The defendant also contends that the state failed to record the prosecutor's instructions to the grand jury as mandated by Rule 6(e) of the Superior Court Rules of Criminal Procedure. This court has repeatedly held that failure to record instructions to or testimony for the grand jury—although required by Rule 6(e)— does not in itself warrant dismissal of an indict-

ment. *See, e.g., State v. Cassey,* 543 A.2d 670 (R.I.1988); *State v. Fernandes,* 526 A.2d 495 (R.I.1987); *State v. Heredia,* 493 A.2d 831 (R.I. 1985). A review of the record satisfies us that the trial justice committed no error in his denial of the motion to dismiss the indictment based upon the prosecutor's failure to record instructions to the grand jury.

U.S. 359, 363, 76 S.Ct. 406, 408–09, 100 L.Ed. 397, 402–03 (1956)).

The defendant excises numerous portions of the grand-jury transcript in support of dismissing the indictment brought against him. Chiellini points to several instances in which Detective Wilson either willfully or recklessly overstated the prosecution's case while engaging in a prolonged colloquy initiated by members of the grand jury. The defendant claims that Detective Wilson misled the grand jury by: reading the police statement of Alan Conklin, defendant's father-in-law, to the jurors in which Conklin states that defendant had raped and beaten other women; asserting that the medical examiner had confirmed that the penknife found in Chiellini's home could have inflicted the wounds on Mester's body; and alluding repeatedly to the possibility that Mester was raped first and then murdered by Chiellini. Detective Wilson also told the grand jurors that partial test results procurred from the FBI Crime Laboratory "confirmed that we believe we got the right guy."

■ We note at the outset that Detective Wilson's remark "we got the right guy" is an improper expression of opinion that invades the province of the grand jury. Nevertheless, we have stated that "as a practical matter grand juries are well aware that they are listening to evidence about a particular case simply because the prosecutor believes that an indictment is merited." *Mainelli*, 543 A.2d at 1313. We believe that such an opinion, although entirely inappropriate, neither surprised the grand jurors nor substantially affected their ability to render an independent and informed decision to charge. Consequently we conclude that this remark alone does not justify dismissal.

■ We similarly believe that Detective Wilson's comment relating to the penknife as a possible murder weapon does not warrant dismissal. This court has noted that "the grand-jury proceeding is a one-sided affair that affords prosecutors great latitude in their comments before the grand jury." *Mainelli*, 543 A.2d at 1313. It is conceivable that during the course of the

investigation Detective Wilson spoke with the medical examiner and learned that the penknife *could have been* used to kill Mester. We decline defendant's invitation to indulge with him in every presumption of subterfuge and prevarication on the part of the state to conclude that the detective blatantly misrepresented facts and medical evidence in order to secure an indictment.

■ More troublesome, however, are Detective Wilson's statements intimating that Chiellini had raped Mester, a crime with which he was not charged, and implying that defendant was a bad character who had sexually assaulted and beaten other women. This testimony was highly improper. However, we do not apply the same standards to evidence submitted to the grand jury as to evidence presented at trial. In determining whether to dismiss an indictment after a conviction by a petit jury, we consider the effect of the alleged improprieties on the grand jury's decision to charge rather than the violations' effect on the ultimate trial verdict. *United States v. Mechanik*, 475 U.S. 66, 76, 106 S.Ct. 938, 945, 89 L.Ed.2d 50, 60 (1986) (O'Connor, J., concurring). In the instant case, Detective Wilson admitted that the medical examiner was unable to test the victim for evidence of sexual abuse. In addition, the prosecutor repeatedly cautioned the jury against considering Chiellini's prior history of violence and instructed jurors to confine their decision to charge to the evidence properly before them. Moreover, much of the evidence presented at trial was available for grand-jury consideration. This evidence included: a report concluding that the blood on defendant's shirt matched the enzyme grouping of Verna Mester; testimony indicating that Chiellini was observed in the vicinity of Mester's last-known whereabouts; defendant's apparently fabricated story to his wife; a statement revealing that pieces of the front grille and taillight lens of Chiellini's car were found near the victim's body; and the testimony of John Jackson, who observed a car, which he later identified as Chiellini's, stuck on a rubbish pile in Merino Park.

In light of the overwhelming circumstantial evidence available to the grand jury and the ultimate verdict reached at trial, we conclude that any violation that occurred did not substantially influence the charging jury's decision to indict or create grave doubt about whether it had such effect. A grand jury needs only probable cause to indict. The petit jury in the instant case found defendant guilty beyond a reasonable doubt without the alleged false and misleading evidence and with substantially similar circumstantial evidence available for its consideration. Any impropriety before the grand jury was harmless beyond a reasonable doubt. Consequently, the trial justice committed no error in refusing to dismiss the indictment.

This court is aware that dismissal of the indictment in the present case could deter future overzealous prosecutorial conduct of a similar nature. Yet, we believe that the substantial social and economic costs of reversal of the conviction after a trial free from reversible error clearly outweigh any perceived deterrent effect upon prosecutorial misconduct.

## II

The second argument advanced by defendant challenges the expert testimony of Peter R. DeForest. Because geometric blood-stain interpretation is not a recognized forensic science in this jurisdiction, defendant argues, no proper foundation was laid for DeForest's testimony. Even assuming arguendo that a foundation was laid, Chiellini contends that the lack of any independent testing by DeForest on the garments at issue rendered his testimony irrelevant. The testimony of DeForest regarding distance was mere speculation not beyond the ken of the jurors, defendant asserts, and the danger of jury prejudice greatly outweighed any possible probative value. We disagree.

The defendant's argument concerning lack of foundation is misplaced. In this jurisdiction, "the use of expert testimony has historically been based on the principle that helpfulness to the trier of fact is the most critical consideration." *State v. Wheeler*, 496 A.2d 1382, 1388 (R.I.1985). It is true that this court will reject "efforts to utilize testimony concerning unreliable tests lacking in true probative value * * *." *State v. Walters*, 551 A.2d 15, 18 (R.I.1988). However, the reliability or general acceptance in the scientific community of geometric blood-stain interpretation was not at issue in the present case because DeForest admitted that he neither performed any scientific tests nor made any elaborate reconstruction of the crime in accordance with routine procedures of blood-stain analysis. In the case at bar, DeForest merely performed a visual inspection of Chiellini's garments under a low-powered microscope and documented these articles in photographs. His testimony was limited to the type of pattern formed by the blood stains and to the maximum distance that the blood droplets could have traveled. DeForest testified that the bloodstains on Chiellini's shirt formed a spatter pattern—meaning that the blood was airborne prior to contact with the garment—and that such a pattern was consistent with stabbing or bludgeoning. DeForest also stated that because of gravity and the air's viscosity, blood droplets of the size found on Chiellini's shirt could have traveled no farther than three to four feet. He further testified that the denser concentration of blood near the left-front pocket suggested that the left side of defendant's shirt was closer to the source of blood than other areas of the garment.[2] We agree with the trial justice's assessment that any competent physicist could have testified to these issues.

It is well settled that "the qualification of an expert witness to testify and the scope of his or her testimony are issues that are left to the sound discretion of the trial justice. His or her ruling on this issue will not be set aside unless a clear abuse of

**2.** Because of the absorbency of the terry-cloth material, DeForest candidly admitted on cross-examination that he was unable to determine the precise angle of the blood's impact, the exact distance from defendant's shirt to the source of blood, or the type of instrument used to kill Mester.

discretion is shown." *State v. Ferola,* 534 A.2d 173, 176 (R.I.1987). We are of the opinion that the trial justice properly allowed DeForest to testify as an expert to the limited issues of the maximum distance that blood droplets could travel and the type of geometric blood-stain pattern found on Chiellini's shirt. The challenged expert in the instant case holds a graduate degree in criminalistics and is a professor of criminology at a leading university. He has coauthored a textbook on forensic science and has published approximately twenty-five articles in scientific journals. More significantly DeForest has reviewed thousands of blood-stain patterns, including several hundred in actual criminal cases. The trial justice committed no abuse of discretion in ruling, after conducting a fairly extensive voir dire, that DeForest was qualified to testify as an expert to the limited scope of his anticipated testimony.

■ The defendant's argument concerning relevance and jury prejudice also misses the mark. This court defines relevant evidence as evidence having any tendency to establish or disprove the existence of a fact material to the crime charged. *State v. Walters,* 551 A.2d at 17–18; *State v. Wheeler,* 496 A.2d at 1388. *See McCormick on Evidence,* § 185 at 542 (3d ed. Cleary 1984); Survey VI, *Evidence Concerning Prior Unrelated Crime Impliedly Committed by Defendant Held Admissible,* 21 Suffolk U.L. Rev. 488, 490 (1987). We shall not disturb a trial justice's ruling on this issue absent a clear abuse of discretion. *Romano v. Ann & Hope Factory Outlet, Inc.,* 417 A.2d 1375 (R.I.1980).

■ In this case based entirely on circumstantial evidence, the expert's testimony tended to prove how the blood came to be on Chiellini's shirt. Although not especially informative, DeForest's testimony was clearly relevant and could have legitimately served as an aid to the jury in resolving the factual issues in dispute. The testimony neither misled the trier of fact nor greatly prejudiced defendant. The fact that DeForest's opinion may not have been highly conclusive or informative goes to the weight of the evidence and not to its

admissibility. *State v. Brennan,* 526 A.2d 483, 489 (R.I.1987) (quoting *State v. Vargus,* 118 R.I. 113, 127, 373 A.2d 150, 157 (1977)).

### III

The third argument proffered by defendant raises a Fourth Amendment search-and-seizure issue. Chiellini argues that the police illegally seized his property when they impounded his vehicle without a warrant or other mitigating circumstances. Despite the fact that the police obtained a warrant before searching the car, defendant contends that all incriminating evidence seized from the vehicle should have been suppressed by the trial justice as fruit of the poisonous tree. In a nutshell, Chiellini claims that his car was unlawfully impounded. The trial justice rejected this argument at the suppression hearing below, concluding that the police actions in towing the car to the garage before obtaining a search warrant "aren't open to question * * * they were, in fact, reasonable." We agree.

■ The Fourth Amendment to the United States Constitution, as well as article I, section 6 of the Rhode Island Constitution, protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." This language has been interpreted by the Supreme Court to establish the bright-line standard that "searches [and seizures] conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." *Katz v. United States,* 389 U.S. 347, 357, 88 S.Ct. 507, 514, 19 L.Ed.2d 576, 585 (1967). One of the well-settled exceptions to the warrant requirement is the so-called *Carroll-Chambers* automobile exception. *Chambers v. Maroney,* 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970); *Carroll v. United States,* 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925). In the Fourth Amendment hierarchy of values, individuals' privacy interests in automobiles are

afforded a lesser degree of protection than their interests in homes or offices. The basis of the *Carroll-Chambers* exception rests on both the ready mobility of automobiles and the lesser expectation of privacy that citizens have in their motor vehicles. *See California v. Carney,* 471 U.S. 386, 391, 105 S.Ct. 2066, 2069, 85 L.Ed.2d 406, 413 (1985); *State v. Timms,* 505 A.2d 1132 (R.I.1986).

In *Chambers v. Maroney, supra,* police officers impounded an automobile in which the defendant was riding at the time of his arrest. Law enforcement authorities then seized evidence from the car in the course of a thorough, warrantless search at the station. Reasoning that the opportunity to search a readily mobile vehicle is fleeting, the United States Supreme Court found the evidence admissible, stating:

"[I]f an effective search is to be made at any time, either the search must be made immediately without a warrant or the car itself must be seized and held without a warrant for whatever period is necessary to obtain a warrant for the search." 399 U.S. at 51, 90 S. Ct. at 1981, 26 L.Ed.2d at 428.

The *Chambers* Court further elaborated:

"Arguably, because of the preference for a magistrate's judgment, only the immobilization of the car should be permitted until a search warrant is obtained * * *. [But][f]or constitutional purposes, we see no difference between on the one hand seizing and holding a car before presenting the probable cause issue to a magistrate and on the other hand carrying out an immediate search without a warrant. Given probable cause to search, either course is reasonable under the Fourth Amendment.

"The probable-cause factor still obtained at the station house and so did the mobility of the car unless the Fourth Amendment permits a warrantless seizure of the car and the denial of its use to anyone until a warrant is secured. In that event there is little to choose in terms of practical consequences between an immediate search without a warrant and the car's immobilization until a warrant is

obtained." *Id.* at 51–52, 90 S. Ct. at 1981, 26 L.Ed.2d at 428–29.

The Court then upheld the warrantless search of the impounded car.

In interpreting article I, section 6 of the Rhode Island Constitution, we declined to follow the *Chambers'* rationale and chose instead to adopt Justice Harlan's dissenting view. Justice Harlan opined that the temporary immobilization of a vehicle at a station house garage for the time needed to secure a warrant generally involved a lesser intrusion into an individual's privacy interest than a full-scale warrantless search. The dissent stated "in the circumstances in which this problem is likely to occur, the lesser intrusion will almost always be the simple seizure of the car for the period—perhaps a day—necessary to enable the officers to obtain a search warrant." *Id.* at 63, 90 S.Ct. at 1987, 26 L.Ed.2d at 435 (Harlan, J., dissenting). Accordingly, in *State v. Benoit,* 417 A.2d 895 (R.I.1980), we held that police officers were required to obtain a warrant before conducting a search on a lawfully impounded vehicle.

■■■ In the case at bar, police officers received information from a credible informant connecting defendant to the murder of Verna Mester. Upon locating Chiellini's damaged car on a public street, one of the detectives remembered seeing pieces of a taillight assembly in close proximity to the victim's body. The officers were unable to locate the driver of the car. In these circumstances, the police had probable cause to believe that evidence of criminal activity was concealed in the automobile. It is the opinion of this court that the Fourth Amendment permits the temporary, warrantless seizure of a car when police officers have probable cause to believe that evidence of crime is concealed therein. Once seized, the vehicle's mobility ends and the danger of removal or destruction of the car's contents is no longer present. The owner's privacy interest in the vehicle has therefore regained paramount importance and the warrant requirement of the State and Federal Constitutions applies. By securing a search warrant promptly after impounding the vehicle, the investigating

authorities commendably followed the requirements promulgated by this court in *State v. Benoit.*

 We believe that law-enforcement authorities should be permitted to take the steps necessary to preserve evidence and to facilitate the type of close examination required of vehicles linked to criminal activity.[3] Any privacy interest in the free movement and control of the automobile surely must yield to society's legitimate concern for effective law enforcement. We cannot agree with the defendant's contention that the seizure was unreasonable simply because the police could have guarded the car while a warrant was secured. As the Supreme Court has stated:

> "Assuming that probable cause previously existed, we know of no case or principle that suggests that the right to search on probable cause and the reasonableness of seizing a car under exigent circumstances are foreclosed if a warrant was not obtained at the first practicable moment. Exigent circumstances with regard to vehicles are not limited to situations where probable cause is unforeseeable and arises only at the time of arrest. * * * The exigency may arise at any time, and the fact that the police might have obtained a warrant earlier does not negate the possibility of a current situation's necessitating prompt police action." *Cardwell v. Lewis,* 417 U.S. 583, 595–96, 94 S. Ct. 2464, 2472, 41 L.Ed.2d 325, 338 (1974).

The temporary, limited infringement of Chiellini's privacy interest through the denial of the automobile's use for the time necessary to obtain a warrant was reasonable, given the facts known to the police at that time. We therefore conclude that the trial justice properly admitted the evidence seized from Chiellini's car.

3. We are unpersuaded by defendant's argument that the vehicle itself was seized as an instrument of crime. The car merely provided evidence linking defendant to the crime scene. There is no indication that Chiellini used his vehicle to kill Mester. The present case is distinguishable from *Cardwell v. Lewis,* 417 U.S. 583, 94 S.Ct. 2464, 41 L.Ed.2d 325 (1974) in which the defendant's vehicle had apparently

For the above-enunciated reasons, the defendant's appeal is denied and dismissed. The judgment appealed from is affirmed. The papers in this case are remanded to the Superior Court.

been used to push the victim's car off an embankment. *Cf. Edlin v. State,* 523 So.2d 42 (Miss.1988), *cert. denied,* —— U.S. ——, 109 S.Ct. 1547, 103 L.Ed.2d 851 (1989) (victim ran off road and defendant's car showed signs of collision). *See* 3 LaFave, *Search and Seizure,* § 7.3(a) at 78–79 (2d ed.1987) (comparing seizure of cars as evidence with warrantless seizures of cars to facilitate later search).