STATE

v.

**Rodger SIMPSON.**

No. 94–679–C.A.

Supreme Court of Rhode Island.

May 26, 1995.

Jeffrey Pine, Atty. Gen., Jane McSoley, Sp. Asst. Atty. Gen., Aaron Weisman, Asst. Atty. Gen., for plaintiff.

Joseph Victor Smith, Newport, for defendant.

## OPINION

MURRAY, Justice.

This matter is before the Supreme Court on the appeal of Rodger Simpson (defendant) from judgments of conviction on counts of first-degree murder, second-degree murder, assault with a dangerous weapon, and breaking and entering with intent to commit murder. After a jury trial in Superior Court, the defendant was sentenced to serve two consecutive life sentences on the counts of first-degree murder and second-degree murder; he received a twenty-year sentence on the charge of assault with a dangerous weapon, to run concurrently with the life sentences, and ten years on the count of breaking and entering with intent to commit murder, to run concurrently with the life sentences. On appeal the defendant argued that the trial justice erred in denying his motions (1) to dismiss the grand jury indictment for first-degree murder, (2) to suppress a photograph taken of him following his arrest, and (3) to pass the case on the basis of comments made by the prosecutor to the jury during closing arguments. We affirm the judgments for the reasons stated below. The facts of the case insofar as pertinent to this appeal are as follows.

On December 17, 1992, defendant was charged by criminal indictment No. P1/92–3741A with two counts in the murders of Beth Crisp (Crisp) and Michael Harris (Harris) in violation of G.L.1956 (1981 Reenactment) § 11–23–1, as amended by P.L.1990, ch. 284, § 4. The defendant was also indicted on one count of assault with a dangerous weapon on the person of Francesco Guerra (Guerra) in violation of G.L.1956 (1981 Reenactment) § 11–5–2, as amended by P.L.1991, ch. 324, § 1, and one count of breaking and entering with intent to commit murder in violation of G.L.1956 (1981 Reenactment) § 11–8–3.

Testimony presented at trial revealed that defendant and Crisp had dated for a period of approximately three years when Crisp terminated the relationship in August of 1992. The defendant apparently had difficulty accepting the breakup and as a result became distraught. On one occasion defendant crashed a party that Crisp was attending and assaulted her when she told him that she did not want to see him anymore. The defendant, aware that Crisp was dating Harris, informed his mother in a handwritten note that he couldn't deal with losing Crisp in addition to losing his job and that he planned to kill Crisp.

On the morning of September 7, 1992, between 9:30 and 9:45 a.m. Guerra, a second-floor tenant of a three-story tenement house located at 11 Roosevelt Avenue in North Providence, heard the sound of six or seven gunshots. When Guerra heard this noise, he quickly opened the front door to his apartment to check if something was wrong and saw defendant coming down the stairs from the third floor with a silver-colored gun in his hand. The defendant then apparently pointed the gun in Guerra's direction, whereupon Guerra slammed the door shut and threw himself to the floor. From a window in his apartment, Guerra then watched defendant walk outside, put the gun into a holster, enter his truck, and leave.

Guerra had previously seen defendant and was aware that he was the boyfriend of Crisp who lived in the third-floor apartment at 11 Roosevelt Avenue. In fact Guerra had seen defendant the previous day, September 6, 1992, driving by the tenement house in his vehicle. Guerra testified that it was the same vehicle he observed defendant driving on September 7, 1992.

Joan Coulmbe (Coulmbe), the first-floor resident at 11 Roosevelt Avenue, heard "popping noises" between 9:30 and 9:45 a.m. on September 7, 1992. When she heard the noise, she jumped up, ran to the door of her apartment, and opened it. She heard the sound of a fire alarm and then heard some-

one walking down the stairs very slowly. Coulmbe then closed the door and through its peephole observed defendant proceed down the stairs. Coulmbe had previously seen defendant in the company of Crisp and was aware that defendant had once been Crisp's boyfriend. She watched defendant walk outside and then drive away in his vehicle. Coulmbe summoned the police and then went outside to wait with Guerra.

Detective Charles Fish (Fish) responded to the call to 11 Roosevelt Avenue and observed damage to the door lock and frame of the doorway to the third-floor apartment where Crisp lived. He saw the bodies of Crisp and Harris lying on the kitchen floor, and he noted the smell of gunpowder in the apartment. Fish also observed shell casings and a bullet on the kitchen floor and apparent bullet damage to the kitchen ceiling. Police retrieved a handwritten note from the wastebasket in Crisp's apartment, apparently written by defendant in which he made references to Crisp's sleeping with other men. An empty cartridge shell, empty shell casings, and a spent bullet were also seized from the apartment.

Police obtained a search warrant for defendant's vehicle and from it collected a Colt Delta Elite handgun with two ammunition clips. Two spent bullets compatible with the weapon were found in defendant's vehicle. Police also seized a note pad from defendant's vehicle imprinted with a logo that was identical to that on a note found on the windshield of Harris's vehicle, which was parked in the driveway at the murder scene.

Sergeant John Arzoomanian (Arzoomanian) of the North Providence police department responded to the call to the scene, photographed it, collected evidence, and took measurements. Later that day, as Captain Albert DeCristofano (DeCristofano) was preparing an arrest warrant for defendant, defendant appeared at the North Providence police station with counsel to cooperate in the investigation, whereupon he was immediately arrested. Photographs and fingerprints were taken of defendant.

■ The defendant contends that the trial justice erred in denying his pretrial motion to dismiss that part of the indictment which charged him with murder as defined by § 11–23–1. He maintains that the members of the grand jury were erroneously instructed only in regard to murder generally, without specification of degree, which in Rhode Island is second-degree murder. Because the members of the grand jury were not instructed as to the specific statutory elements of first-degree murder, defendant avers the indictment does not constitute a prime facie finding of probable cause of first-degree murder and must therefore be limited to second-degree murder. We disagree.

We have long recognized "that a grand jury is an appendage of [this] court and subject to [our] supervision." *In re Buxton*, 111 R.I. 480, 482, 304 A.2d 350, 352 (1973); *State v. Edwards*, 89 R.I. 378, 385, 153 A.2d 153, 158 (1959). Generally we have subscribed to the principle articulated by the United States Supreme Court that "[a]n indictment returned by a legally constituted and unbiased grand jury, like an information drawn by the prosecutor, if valid on its face, is enough to call for a trial of the charge on the merits." *Costello v. United States*, 350 U.S. 359, 363, 76 S.Ct. 406, 409, 100 L.Ed. 397, 402–03 (1956). Accordingly, we have taken the view that the dismissal of an indictment on review is an extraordinary sanction. *State v. Chakouian*, 537 A.2d 409, 413 (R.I. 1988). "To dismiss an indictment on review 'means that even though a jury unanimously found a defendant guilty beyond a reasonable doubt, we would nevertheless void his conviction because the prosecution had made a misstep in obtaining a grand jury determination of probable cause. Hence, the sanction sought is reserved for very limited and extreme circumstances.' " *Id.* (quoting *State v. Romano*, 456 A.2d 746, 750 (R.I.1983)). Moreover, "[b]oth this court and the United States Supreme Court have held that a conviction by a petit jury after a full trial on the merits renders harmless any defect occurring during the grand jury proceedings." *State v. Woodson*, 551 A.2d 1187, 1190 (R.I.1988).

In ruling on defendant's motion to dismiss the indictment, the trial justice questioned the prosecutor about whether the state had in fact explained to the members of the grand jury the elements of first-degree mur-

der. The prosecutor for the state, who was the same prosecutor who presented the case to the grand jury, responded that he had "read the statute" to the grand jury. The trial justice, satisfied that the members of the grand jury had been properly charged, denied defendant's motion to dismiss the indictment.

Our review of the instructions given to the grand jury reveals that the prosecutor did not read § 11–23–1 in its entirety but instead articulated the following instruction:

> "[T]he unlawful killing of a human being with malice aforethought is murder, so any unlawful killing of another human being with malice aforethought is murder. It's not your consideration at this point to determine what degree of murder it is, there are lesser included offenses that some day a petit jury will probably consider if you choose to indict. But for our purposes all we'd like you to consider here is murder—whether or not the unlawful killing of a human being with malice aforethought was reasonably satisfied—that was perpetrated by Rodger Simpson on Beth Crisp and Michael S. Harris."

The prosecutor further instructed the members of the grand jury with respect to the definition of malice aforethought. That instruction provided as follows:

> "Malice aforethought express or implied is an element of both first and second degree murder. Malice may consist of an unjustified disregard for the possibility of death or great bodily harm and extreme indifference to the sanctity of human life. Malice may be inferred from the very nature of the killing itself. Malice aforethought is the sole element of second degree murder that the state must demonstrate by evidence capable of generating proof beyond a reasonable doubt—but that's on the petit jury level."

The defendant contends that although malice aforethought is a necessary element of first-degree murder, it alone is not sufficient to establish a prima facie case. The defendant correctly states that § 11–23–1 requires the state to establish additional elements for first-degree murder. The statute provides in part:

> "The unlawful killing of a human being with malice aforethought is murder. Every murder perpetrated by poison, lying in wait, or any other kind of wilful, deliberate, malicious and premeditated killing, or committed in the perpetration of, or attempt to perpetrate any arson or any violation of §§ 11–4–2, 11–4–3 or 11–4–4, rape, any degree of sexual assault or child molestation, burglary or breaking and entering, robbery, kidnapping, or committed during the course of the perpetration, or attempted perpetration, of felony manufacture, sale, delivery or other distribution of a controlled substance otherwise prohibited by the provisions of chapter 21 of title 28, or while resisting arrest by, or under arrest of, any state trooper or policeperson in the performance of his or her duty; or perpetrated from a premeditated design unlawfully and maliciously to effect the death of any human being other than him or her who is killed is murder in the first degree. Any other murder is murder in the second degree."

It is clear that the prosecutor did not in his charge to the members of the grand jury delineate the specific elements of the crime of first-degree murder as set forth in the statute. The prosecutor's charge was limited to the statutory definition of murder: "[t]he unlawful killing of a human being with malice aforethought." Section 11–27–1. His charge to the grand jury was supplemented with the definition of malice aforethought. Thus, the issue is whether the limited nature of the prosecutor's charge adequately informed the members of the grand jury with respect to the elements of murder so as to enable them to make a determination about the existence of probable cause.

We addressed a somewhat similar argument to that being pursued by defendant in *State v. Chakouian,* 537 A.2d at 413. In that case the prosecutor who presented the case to the grand jury did not instruct the grand jurors on the elements of murder although on several previous matters the prosecutor had provided the same grand jurors with a detailed legal description of the crime. In upholding the denial of defendant's motion to dismiss the indictment, we opined that the

trial justice correctly ruled that the grand jurors had been adequately instructed on the elements of murder during previous matters. *Id.* However, we noted that "it is the better practice for the prosecutor to instruct the grand jury on the elements of each charge in every matter before it." *Id.*

This case differs, however, from *Chakouian* inasmuch as the prosecutor in the instant case did inform the grand jury of the statutory definition of murder even though the specific elements of first-degree murder were not articulated. The prosecutor's omission of the specific elements of first-degree murder in his instruction to the grand jury is not an "extreme circumstance" that merits dismissal of the indictment. *See United States v. Kenny*, 645 F.2d 1323 (9th Cir.1981).

The adequacy of the the prosecutor's charge to the grand jury is further supported by the last sentence of § 11–23–1:

"*The degree of murder may be charged* in the indictment or information, therefor, and the jury may find the degree of murder, whether the same be charged in the indictment or information or not, or may find the defendant guilty of a lesser offense than that charged in the indictment or information, in accordance with the provisions of § 12–17–14." (Emphasis added.)

Pursuant to this provision, the degree of murder need not be specified in the indictment. Although this provision relates to the form of the indictment, we believe the inclusion of this language in the statute supports our finding that the prosecutor's instruction was sufficient to inform the members of the grand jury of the elements of murder so as to enable them to make a determination concerning the existence of probable cause. We therefore reject defendant's contention that the indictment returned by the grand jury charging him with murder generally precluded the petit jury from convicting him of murder in the first-degree.

■ Next defendant argues that his arrest was invalid as a result of its having been made without probable cause. The defendant further argues that the photograph taken of him by the North Providence police should not have been admitted by the trial justice since it was the fruit of an illegal arrest. Prior to trial defense counsel conceded that the affidavit police presented to a District Court judge provided sufficient probable cause to justify the issuance of a warrant for the search of defendant's vehicle. At the same time defense counsel preserved any subsequent objections that he may raise in connection with the warrantless arrest of defendant. The next time the issue of defendant's warrantless arrest was raised at trial occurred in connection with the fingerprints taken of defendant. Defense counsel objected to the admission of the fingerprint evidence in the absence of foundation in regard to probable cause to support the arrest. The trial justice overruled defense counsel's objection, finding the existence of "ample probable cause which eliminate[d] the requirements of a warrant."

We have long recognized that a warrantless arrest may be made only in those situations in which police possess probable cause to believe a suspect has committed an offense. *State v. Travis*, 568 A.2d 316 (R.I. 1990); *State v. Brennan*, 526 A.2d 483 (R.I. 1987). This court has on numerous occasions defined "probable cause as knowledge of those facts and circumstances along with reasonable trustworthy information that would cause a prudent officer to believe that the suspect had committed a crime." *State v. Ellis*, 619 A.2d 418, 425 (R.I.1993) (citing *State v. Pacheco*, 481 A.2d 1009, 1021–22 (R.I.1984); *In re John N.*, 463 A.2d 174, 178 (R.I.1983); *State v. Welch*, 441 A.2d 539, 541 (R.I.1982)).

We stated in *In re Armand*, 454 A.2d 1216, 1218 (R.I.1983):

"[A] general principle applicable here is that the mosaic of facts and circumstances must be viewed cumulatively 'as through the eyes of a reasonable and cautious police officer on the scene, guided by his or her experience and training.' * * * Moreover, in our review we must examine the completed mosaic in terms of what the police knew, what they heard, and what they observed as trained officers." *Id.*

Our obligation in dealing with this question is to exercise our independent judgment while giving reasonable deference to the findings of fact made by the trial justice. *Ker v. California*, 374 U.S. 23, 32, 83 S.Ct. 1623, 1629,

10 L.Ed.2d, 726, 737 (1963); *State v. Jenison*, 442 A.2d 866, 872 (R.I.1982).

Viewing the facts surrounding defendant's arrest in light of the standards enunciated in the cases cited herein, we hold in the exercise of independent judgment that the facts unerringly point to the conclusion that the North Providence police officers had probable cause to believe that defendant was responsible for the crimes committed. Prior to defendant's arrest, police had interviewed Guerra and Coulmbe, both tenants in the apartment where Crisp and Harris were murdered and who heard the sounds of gunfire. Coulmbe saw defendant walk down the stairs; Guerra also encountered defendant in the stairway where defendant pointed the gun in his direction. Both Guerra and Coulmbe recognized defendant on the basis of his relationship with Crisp and gave police a description of defendant's vehicle and its license number, which was subsequently identified as assigned to defendant. Additionally, police had interviewed Crisp's sister, Beth, who had mentioned defendant as the likely suspect in the murder of Crisp. In fact, while DeCristofano was preparing the warrant for defendant's arrest, defendant walked into the police station accompanied by his attorney to "cooperate in the investigation." These facts support the conclusion that the police had more than sufficient probable cause to arrest defendant without a warrant.

Consequently, we are of the opinion that the trial justice did not err in finding probable cause and in denying defendant's motion to suppress the fruits of his arrest.

■ In defendant's final assertion of error he claims that statements made by the prosecutor in the course of his closing argument to the jury warranted the granting of a mistrial.[1] The defendant complains about the following portions of the prosecutor's argument.

"MR. DE CAPORALE: * * * This trial is about, as I told you early on, a 23 year old young lady, 28 year old man, but it doesn't end there. Because there are other victims in this case. We have the abili-

ty as far as mothers, aunts and uncles to live the lives of our children vicariously. The scum—

"MR. CASPARIAN: Objection.

"MR. DE CAPORALE: Continued .... who sat in this chair—

"MR. CASPARIAN: Objection to the word scum.

"THE COURT: Sustained.

"MR. DE CAPORALE: Continued .... deprived the mother, the father the family and the friends and the relatives—

"MR. CASPARIAN: I object. He's inflamming the passions of the jury, and I move to pass.

"THE COURT: The objection is overruled, and your motion is denied. You may continue.

"MR. DE CAPORALE: Continued .... of any more Christmases, anymore birthdays, anymore involvement at all.

"MR. CASPARIAN: I renew my objection. Same line of argument by the prosecutor. I'm sorry to interrupt. Objection.

"THE COURT: Objection is overruled. Perhaps you can restrain from objecting until the finality of the argument. Make notes of your objection, and we'll consider them at that time.

\*       \*       \*       \*       \*       \*

"MR. DE CAPORALE: Got any doubt about the premeditation. I want you to take a look at * * * the torture that this young girl must have been going through preceding her butchering. The garbage that was spewed from this defendant's mouth, and I apologize—I apologize for having to expose you 12, 14 fair minded decent people to this scum, garbage.

"MR. CASPARIAN: I object.

"Mr. DE CAPORALE: But I am going to read it to you.

"MR. CASPARIAN: I object.

---

1. The defendant exercised his constitutional right to waive being present in the courtroom during closing argument.

"THE COURT: Please try to refrain from the use of such words as scum. Your objection is sustained to that extent.

\* \* \* \* \* \*

"MR. DE CAPORALE: \* \* \* I get off on a tangent because I get so angry at even the inference that this was anything but a premeditated, malicious, cold-blooded, vicious murder.

"MR. CASPARIAN: I am going to object. I am going to move to pass.

"THE COURT: Your objection is overruled. The motion is denied."

The prosecutor further admonished the jury that the state "will be very, very disappointed if there's any verdict other than murder in the first degree."

After the prosecutor concluded his remarks, both attorneys were asked by the trial justice to approach the bench. The dialogue that occurred during this bench conference was not transcribed by the court reporter and no further remarks are gleaned from the record with respect to the objections raised by defense counsel to the prosecutor's argument. Consequently, we cannot discern whether defense counsel pursued his initial objections or whether the trial justice made a ruling with this regard.

The defendant asserts that the above statements articulated by the prosecutor were unsupported by the evidence, were prejudicial, and tended to inflame the passions of the jury. The state concedes that certain remarks made by the prosecutor "exceeded the bounds of propriety," specifically, the statement about the victims' relatives being deprived of their families. Further, the state also concedes that defense counsel's failure to request a cautionary instruction does not automatically deem the matter waived since his request would probably have been futile on the basis of the trial justice's previous rulings. Consequently, there would have been little point in requesting a cautionary instruction. However, the state argues that any error committed by the prosecutor was harmless because defendant has failed to demonstrate sufficient prejudice.

In *State v. Mead*, 544 A.2d 1146, 1150 (R.I.1988) (citing *DeShields v. State*, 534 A.2d 630, 642 (Del.1987)), we expressed that "[a]ppeals to the jurors' sympathy or emotions are to be rejected because they go beyond the facts of the case and the reasonable inferences to be drawn from such facts." It is essential that a guilty verdict be "based upon the evidence \* \* \* rather than 'an irrational response that may be triggered if the prosecution unfairly strikes an emotion in the jury.'" 544 A.2d at 1150. We believe the comments made by the prosecutor in the instant case went beyond the bounds of proper argument. His remarks were clearly intended to elicit juror sympathy for the victims' families and, as such, were improper. Moreover, the prosecutor's calling the defendant "scum" was clearly inappropriate argument. Nevertheless, the prosecutor's remarks were harmless because of the overwhelming evidence of the defendant's guilt and because the trial justice's final instructions to the jury contained a statement in which he emphasized that arguments of counsel are not evidence.

Accordingly, the defendant's appeal is denied and dismissed. The judgments of conviction appealed from are affirmed, and the papers of the case are remanded to the Superior Court.

BOURCIER, J., did not participate.