**STATE**

v.

**Rohan RUSSELL et al.**

No. 2004–338–C.A.

Supreme Court of Rhode Island.

July 3, 2008.

Aaron Weisman, Providence, for Plaintiff.

Camille A. McKenna, Providence, for Defendant Rohan Russell.

George West, Providence, for Defendant Fode Sidibe.

Present: WILLIAMS, C.J., GOLDBERG, FLAHERTY, SUTTELL, and ROBINSON, JJ.

## OPINION

Justice SUTTELL, for the Court.

The focal point of this appeal is the proper role of the prosecuting attorney in grand jury proceedings.[1] More specifically, we are asked to adopt a rule requiring prosecutors to present substantially exculpatory evidence to the grand jury.

The defendants, Rohan Russell and Fode Sidibe, each appeal from a judgment of conviction on two counts of first-degree sexual assault, for which they were sentenced to twenty years, with eight years to serve. Both defendants contend that a hearing justice erroneously denied their pretrial motion to dismiss the indictment because of several instances of alleged prosecutorial misconduct. The defendants also raise an argument we understand to be that they were denied due process and equal protection of the law because they were not appointed counsel either before or at the secret grand jury proceedings. Finally, Mr. Sidibe argues that the trial justice improperly denied defendants' motion for a new trial. For the reasons set forth in this opinion, we affirm the judgments of conviction.

## I

### Facts and Procedural History

The events that led to defendants' con-

---

1. In undertaking this examination we are reminded of the wry observation of Sol Wachtler, former Chief Judge of the New York Court of Appeals, to the effect that any good prosecutor can get a grand jury to "indict a ham sandwich." The comment has since become immortalized in Tom Wolfe's novel, "The Bonfire of the Vanities." Tom Wolfe, *The Bonfire of the Vanities* 603 (1987).

victions occurred on May 21, 2001.[2] On that date, Barbara, then a junior at the Davies Career and Technical High School (Davies) in Lincoln, Rhode Island, missed her bus after school. Barbara, who was seventeen at the time, was effectively stranded and needed a ride to her home in Pawtucket. While Barbara contemplated her predicament, she saw James Benton, who at the time was the truancy officer and basketball coach at Davies. In addition to his regular duties, Mr. Benton monitored the area outside the school at the end of the day to ensure that students made their way home in an orderly manner. After some discussion with Mr. Benton, Barbara accepted a ride from Mr. Russell, Mr. Sidibe, and a third person, Onix Delvalle. Mr. Russell, Mr. Sidibe, and Mr. Delvalle graduated from Davies in 2000. They were at school on May 21, 2001, for employment assistance from the school's career center. Barbara was acquainted with Mr. Russell through her brother and with Mr. Sidibe from her attendance at high school basketball games.

Barbara departed school in Mr. Russell's car, with Mr. Russell driving, Mr. Delvalle in the front passenger seat, and Barbara and Mr. Sidibe in the backseat. At trial, Barbara testified that she initially thought they would take her home directly, but that the car made several stops. Mr. Russell stopped first at a machinery company to drop off a job application. Barbara alleged that when Mr. Russell went inside to apply, Mr. Sidibe placed a compact disc in his pants and asked her to retrieve it. At the next stop, the Community College of Rhode Island (CCRI), Mr. Russell and Mr. Delvalle proceeded inside, leaving Barbara and Mr. Sidibe in the car. Barbara testified that Mr. Sidibe proposi-

tioned her for fellatio, tried to unzip her pants, began touching her, and repeatedly asked her for sex. When Mr. Russell and Mr. Delvalle came back to the car, Mr. Sidibe told them that Barbara offered to have sex with all three men. At trial, Barbara testified that Mr. Russell turned to her and asked whether it was true, and she responded in the negative.

After leaving CCRI, Mr. Russell drove by the exit for Barbara's home and continued on to a Wendy's restaurant. As the car traveled down the highway, the three men talked about having sex with her, but she remained silent. When the car reached the Wendy's drive-through, Barbara alleged, Mr. Delvalle took out a knife, showed a scratch on his body, and said to her, "That's what they do when you don't answer." After leaving Wendy's, Barbara testified, Mr. Sidibe began pushing her head down onto his pants.

Mr. Russell subsequently drove to his apartment. Barbara testified that she attempted to stay outside in the parked car, but that Mr. Sidibe took her arm and said, "Let's go." Once inside the apartment, Barbara went into the living room while Mr. Russell, Mr. Sidibe and Mr. Delvalle went into a different room. The three men encouraged Barbara to join them and she eventually left the living room and entered Mr. Russell's bedroom. Once inside the bedroom, Barbara saw that the three men were looking at pictures of girls from Davies, some of whom were depicted without clothes. Barbara testified that Mr. Russell dropped a condom on the floor next to her and asked, "Who do you want to do first?" Barbara testified that Mr. Russell offered to give her a dog she saw through a window if she agreed to have sex with the three men. Eventually Mr.

**2.** Our recitation of the "facts" is taken primarily from the trial testimony of the complaining witness, to whom we refer as "Bar-

bara," a fictitious name. As will be discussed *infra,* defendants vehemently disputed Barbara's version of events.

Russell put a blanket over her head while she sat on a bed. She also alleged that he told her not to tell anyone what was happening. Thereafter, Barbara testified that Mr. Russell and Mr. Sidibe took turns having intercourse with her and forcing her to have oral sex. Barbara alleged that she said, "Stop, please stop," throughout the episode. Mr. Delvalle assisted the other two men by holding her legs.

After the incident was over, the three men dropped Barbara off near her home in Pawtucket. The next day, at school, Barbara told a friend that she had been raped. Barbara also testified that she told Mr. Benton about the rape. At trial, she alleged that Mr. Benton responded: "Are you sure * * * Keep it between me and you. I will talk to the boys. I will find out their part of the story." Barbara testified that she told another teacher about the rape the day after she spoke to Mr. Benton, and she was referred to the school's guidance counselor. The school notified Barbara's uncle, her legal guardian, and she eventually visited a hospital and spoke with the police.

On January 22, 2002, a grand jury issued an indictment charging Mr. Russell and Mr. Sidibe with several counts of first-degree sexual assault, in violation of G.L. 1956 § 11-37-2, and conspiracy to commit first-degree sexual assault.[3] The state subsequently dismissed the conspiracy count under Rule 48(a) of the Superior Court Rules of Criminal Procedure, and it amended the charges against Mr. Russell and Mr. Sidibe to one count of first-degree sexual assault for vaginal intercourse and one count of first-degree sexual assault for fellatio for each defendant.

On January 6, 2003, Mr. Russell and Mr. Sidibe moved to dismiss the indictment because of alleged irregularities that occurred before the grand jury. The defendants contended that the state improperly withheld exculpatory evidence from the grand jury and that the state's prosecuting attorney incorrectly informed the grand jury that Mr. Russell and Mr. Sidibe had exercised their right against self-incrimination and did not wish to appear before the grand jury. The state objected to the motion as untimely, but the hearing justice exercised his discretion under Rule 12(b) of the Superior Court Rules of Criminal Procedure and decided the motion on the merits. On February 7, 2003, the hearing justice denied defendants' motion to dismiss, reasoning that the dismissal of an indictment is an extraordinary sanction and that the prosecutor's conduct did not substantially influence the grand jury's decision to indict. The Superior Court also explained that "Rhode Island is among the minority of jurisdictions that follow the traditional view that the prosecutor has no duty to present evidence favorable to the target."

The trial occurred in April 2004 before a different Superior Court justice. At trial, defendants challenged Barbara's version of events. Mr. Russell and Mr. Sidibe testified that they had sex with Barbara but that it was consensual. Mr. Sidibe alleged that Barbara used to flirt with him at school and call him "every night," and that she offered to have sex with all three men during the car ride. Mr. Russell's sister testified that she was at home at the time of the incident and that Barbara was laughing and smiling as she left the apartment. Further, Mr. Benton alleged at trial that he crossed paths with Barbara at school the day after the incident and that she "had a big smile" when she asked him

---

**3.** The grand jury also charged Onix Delvalle with crimes, and he joined many of the pretrial motions described in this opinion. Eventually, Mr. Delvalle pled *nolo contendere* to felony assault, and received a five-year deferred sentence.

whether the three men had told him what happened. Mr. Benton testified that she did not tell him about the alleged rape for another few days, after which he said he wanted to talk to defendants to get "their side of the story."

The jury returned guilty verdicts with respect to each defendant on one count of first-degree sexual assault for vaginal intercourse and one count of first-degree sexual assault for fellatio. The defendants moved for a new trial, which the trial justice denied on April 27, 2004. Mr. Russell and Mr. Sidibe each was sentenced to twenty years, with eight years to serve. The Superior Court entered the judgments of conviction on July 16, 2004, after which defendants filed timely notices of appeal.

We address Mr. Russell and Mr. Sidibe's assignments of error sequentially. Additional facts will be supplied as needed.

## II

### Discussion

The thrust of defendants' primary argument on appeal is that the hearing justice erred in denying their pretrial motion to dismiss the indictment, thereby denying them a fair, impartial, and common-law grand jury and due process as guaranteed by both the United States and Rhode Island Constitutions. They assert that the events that occurred in the grand jury proceedings considered individually or collectively substantially influenced the grand jury's decision to indict. The defendants also urge us to adopt a rule requiring prosecutors to present substantially exculpatory evidence to grand juries.

Article 1, section 7, of the Rhode Island Constitution provides in part that "no person shall be held to answer for any offense which is punishable by death or by imprisonment for life unless on presentment or indictment by a grand jury," and further that "[n]othing contained in this article shall be construed as in any wise impairing the inherent common law powers of the grand jury." As this Court explained in *In re Opinion to the Governor*, 62 R.I. 200, 205, 4 A.2d 487, 489 (1939):

"From the history of the grand jury, only briefly outlined here, in England and in Rhode Island up to the time of the adoption of our constitution, and from a consideration of the language of sec. 7, we draw the natural and, as we think, the necessary conclusion that the framers of our constitution, by writing that section into the bill of rights, intended to secure thereby to every person who might be accused of a serious crime the same protection as had been provided by the common law, through the same kind of grand jury which was traditional at common law and functioning in substantially the same way, being the only kind of grand jury that such framers knew."

This Court also recently has recognized the "special nature of the constitutional office of Attorney General in this state." *State v. Lead Industries Association, Inc.*, 951 A.2d 428, 470, 2008 WL 2605396 (R.I. 2008). Noting that "the office[ ] of the state's Attorney General [is] the very office entrusted with protecting the constitutional rights of the citizens of this state," *State v. DiPrete*, 710 A.2d 1266, 1282 (R.I. 1998) (Bourcier, J., dissenting), we confirmed the "special and enduring duty" of the Attorney General to "seek justice." *Lead Industries Association, Inc.*, at 475. The clarion exhortation of the United States Supreme Court in *Berger v. United States*, 295 U.S. 78, 88, 55 S.Ct. 629, 79 L.Ed. 1314 (1935), bears repeating:

"The United States Attorney is the representative not of an ordinary party

to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. As such, he is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer. He may prosecute with earnestness and vigor—indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one."

■ This Court has "long recognized 'that a grand jury is an appendage of [this] court and subject to [our] supervision.'" *State v. Simpson*, 658 A.2d 522, 524 (R.I. 1995) (quoting *In re Buxton*, 111 R.I. 480, 482, 304 A.2d 350, 352 (1973)). "Rhode Island, unlike some jurisdictions, has continued to adhere to the traditional grand jury model." *State v. Franco*, 750 A.2d 415, 419 (R.I.2000). The traditional role of the grand jury in Rhode Island is "to decide whether the evidence presented to it, unexplained and uncontradicted, gives rise to a sufficient quantum of proof to warrant the return of a formal accusation of crime." *State v. Acquisto*, 463 A.2d 122, 127 (R.I.1983). We have explained that " 'in this country as in England of old the grand jury has convened as a body of laymen, free from technical rules,' a group of individuals who are 'free to make their presentments or indictments on such information as they deemed satisfactory.'" *Franco*, 750 A.2d at 419 (quoting *Costello*

*v. United States*, 350 U.S. 359, 362, 76 S.Ct. 406, 100 L.Ed. 397 (1956)). "[O]ur grand juries [perform] the 'interrelated but distinct functions' of investigating and indicting." *State v. Guido*, 698 A.2d 729, 735 (R.I.1997). "In its indicting capacity, the grand jury is said to act as a shield, * * * thereby protecting the public from baseless prosecutorial accusations. In its investigating capacity the grand jury is said to act as a sword, ferreting out criminal conduct." *Id.* (internal citation omitted).

## A

### The Failure to Present Exculpatory Evidence

■ The defendants first assign error to the hearing justice's denial of their motion to dismiss the indictment for failure of the prosecutor to present exculpatory evidence to the grand jury. Moreover, they urge this Court to adopt a rule that would require state prosecutors to present substantially exculpatory evidence to Rhode Island grand juries.[4] They contend that such a rule would not impose an undue burden on the grand jury system, and that it would recognize the grand jury's dual functions of determining probable cause and protecting citizens from prosecutorial overreaching. Mr. Russell and Mr. Sidibe argue that their assertions of consensual sex with Barbara amount to substantially exculpatory evidence because their testimony would have deterred the grand jury from finding the existence of probable cause and negated guilt. Both defendants characterize the case before the grand jury as a "he said, she said" dispute, whereby probable cause would not exist if

---

4. We also wish to thank *amicus curiae,* the Office of the Public Defender, for its helpful brief. Like defendants, *amicus* urges this Court to require prosecutors to present substantially exculpatory evidence to grand juries.

the grand jury believed defendants' version of events.

Several of our cases have touched upon the introduction of exculpatory evidence in grand jury proceedings. In *Acquisto*, 463 A.2d at 126–27, the defendant moved to dismiss the indictment based on the prosecutor's failure to present three letters from a key witness that tended to establish the witness's bias and impeached her credibility. This Court upheld the denial of the motion to dismiss and said, "assuming, without deciding, that the letters in question tended to be exculpatory, we believe that the failure to present these letters [to the grand jury] did not constitute cause to invalidate the indictment." *Id.* at 127. We quoted *Acquisto* with approval in *Lerner v. Moran*, 542 A.2d 1089, 1093 (R.I. 1988), in which we explained that this Court would reject a motion to dismiss the indictment even if a key witness "perjured himself before the grand jury on matters relating to promises made to him in exchange for his testimony."

After *Lerner*, the United States Supreme Court decided, as a matter of federal law, that a court may not dismiss an otherwise valid indictment because the government failed to disclose substantially exculpatory evidence to the grand jury. *United States v. Williams*, 504 U.S. 36, 45–47, 112 S.Ct. 1735, 118 L.Ed.2d 352 (1992). This Court discussed *Williams* with approval in *State v. Ellis*, 619 A.2d 418, 427 (R.I.1993), a case that involved certain statements made by a key witness that were inconsistent with other information known to the prosecution. The *Ellis* Court noted that "[w]e do not require that evidence that may later be determined by counsel for the defense to be exculpatory must be presented to the grand jury on pain of dismissal of the indictment." *Id.*

Mr. Russell and Mr. Sidibe seek to distinguish our previous cases on the basis that they addressed impeachment and credibility evidence. The defendants contend that their assertion of consensual sex is different because the statute they were charged under, § 11–37–2, requires that the sexual act be nonconsensual. They allege their proposed grand jury testimony is substantially exculpatory because it would have addressed an essential element of the crimes at issue.

Definitions of "substantially exculpatory" are, for the most part, quite similar. The Tenth Circuit, in a line of cases decided before *Williams*, adopted a rule that defined substantially exculpatory as, "although a prosecutor need not present all conceivably exculpatory evidence to the grand jury, it must present evidence that clearly negates guilt." *United States v. Reid*, 911 F.2d 1456, 1460 (10th Cir.1990) (quoting *United States v. Page*, 808 F.2d 723, 727 (10th Cir.1987)). According to a leading treatise on grand jury practice, "[m]ost states that recognize a prosecutorial duty * * * require[ ] the prosecutor to present to the grand jury evidence that is clearly exculpatory, in other words, evidence that would exonerate the accused or lead the grand jury to refuse to indict." Sara Sun Beale et al., 1 *Grand Jury Law and Practice*, § 4:17 at 4–85 (2d ed.2005). Another commentator defines substantially exculpatory evidence as evidence that directly negates or contradicts evidence of the defendant's guilt. R. Michael Cassidy, *Toward a More Independent Grand Jury: Recasting and Enforcing the Prosecutor's Duty to Disclose Exculpatory Evidence*, 13 Geo. J. Legal Ethics 361, 369 (2000). The commentator explains that "[u]nlike general exculpatory evidence, which may simply cast some doubt on the credibility of government witnesses (such as impeachment evidence), evidence that affirmatively suggests that the defendant did not commit the crime, or that someone else did, is

directly relevant to the grand jury's accusatory function."[5] *Id.*

We decline defendants' invitation to adopt a rule requiring prosecutors to present substantially exculpatory evidence to grand juries within the context of this case, however, because we reject their underlying premise that the proposed evidence was substantially exculpatory.[6] The state presented to the grand jury Barbara's testimony, in which she alleged Mr. Sidibe and Mr. Russell engaged in nonconsensual sex with her. The defendants did not have—and the prosecutor was not aware of—evidence that they did not engage in the sexual act at all, for example, that they were elsewhere at the time of the alleged incident.

The core of defendants' contention is that their version of events could have refuted Barbara's testimony in the eyes of the grand jury. This Court is of the opinion that defendants' assertion of consensual sex as substantially exculpatory evidence is really a challenge to the competency of the evidence before the grand jury. Cast in this light, defendants' argument must fail. We long have relied upon *Costello*, "in which the United States Supreme Court declined to establish a rule permitting defendants to challenge indictments on the ground that they are not supported by adequate or competent evidence." *Franco*, 750 A.2d at 419. Even if we deviated from *Costello*, which we emphatically decline to do, we also have explained in the grand jury context that a "subsequent guilty verdict means not only that there was probable cause to believe that [defendant was] guilty as charged, but also that [he is] in fact guilty

as charged beyond a reasonable doubt." *State v. Stone*, 924 A.2d 773, 782 (R.I. 2007) (quoting *State v. Tempest*, 660 A.2d 278, 280 (R.I.1995)). The fact that Mr. Sidibe and Mr. Russell, after presenting their version of events, were found guilty beyond a reasonable doubt by a petit jury silences any question about the competency of the evidence before the grand jury, or indeed about the exculpatory nature of the evidence that defendants might have offered.

In sum, this Court concludes that Mr. Sidibe and Mr. Russell did not possess substantially exculpatory evidence known to the prosecutor during the grand jury proceedings. Because we have determined that no substantially exculpatory evidence exists in this case, we reject defendants' argument that the hearing justice erred in denying their motion to dismiss the indictment for the failure of the prosecutor to present such evidence to the grand jury.

## B

### Prosecutorial Misconduct Before the Grand Jury

■ Mr. Sidibe and Mr. Russell also contend that the Superior Court erroneously denied their motion to dismiss the indictment because of prosecutorial misconduct that occurred during the grand jury proceedings. The defendants allege that the prosecutor precluded the grand jury from performing its common-law functions by preventing it from investigating and hearing evidence from Mr. Russell and Mr. Sidibe. Specifically, defendants contend that the prosecutor improperly

---

5. Indeed, we are hard pressed to envision a prosecutor continuing a quest for an indictment in the face of evidence that clearly negates guilt.

6. We do note, however, that the state represented to this Court at oral argument that it recently promulgated a new policy that requires prosecutors to present substantially exculpatory evidence to grand juries.

commented on their Fifth Amendment right against self-incrimination, inaccurately stated that defendants did not wish to appear before the grand jury, and dissuaded the grand jury from issuing subpoenas. Mr. Sidibe and Mr. Russell argue that it is irrelevant whether the prosecutor acted in good faith. The defendants also allege error on the basis that the prosecutor failed to notify them of the investigation and failed to secure an opportunity for them to testify before the grand jury.

Mr. Sidibe and Mr. Russell note that the grand jury convened in secret and that they had no knowledge of the proceeding and never declined to appear before it. The defendants also observe that it is not inappropriate for targets to appear before grand juries. Mr. Russell and Mr. Sidibe conclude that "the grand jury was substantially influenced by the flagrant prosecutorial misconduct in this case," and that the alleged misconduct rises to the level of a due-process violation "because the resulting indictment infected the trial process and resulted in a denial of the defendant's right to a fair trial."

To support their contentions, Mr. Sidibe and Mr. Russell point to the following colloquy between the prosecutor, a witness, and the grand jury:

"[PROSECUTOR]: Okay. Um, okay. That's-that's all I have for the Detective. Anybody have any questions for the Detective?

" * * *

"UNIDENTIFIED SPEAKER: Did you ever question the suspects at any point?

"THE WITNESS: I—

"[PROSECUTOR]: Um, I'm going to—yes. Because they have a Fifth Amendment right against self-incrimination, they, um, do not have to—have to give a statement. They are absolutely entitled not to give a statement and it would be inappropriate to ask him whether they did or didn't. Okay. Again, and please, don't infer anything in any way, you know, based upon that lack of information. Okay. Because, again, they have the right not to say anything.

"UNIDENTIFIED SPEAKER: The question was did he ask her—did he ask them anything? We can't know that?

"[PROSECUTOR]: It would be—because they have a Fifth Amendment right not to say anything, that information would be inappropriate for you because—because they have a Fifth Amendment Constitutional right to say nothing at all.

"UNIDENTIFIED SPEAKER: Did they do that?

"[PROSECUTOR]: And that is what I'm telling you, it's inappropriate for you to know that information. You have to evaluate the case based upon what the Detective is telling you here because there—because, as we talked about, they're innocent until proven guilty, um, and because they have a Fifth Amendment right against self-incrimination and they do not have to give any statements, that you cannot draw any inferences one way or another from that—from that information. So, it would be inappropriate to question them as to whether or not they gave statements, didn't give statements. Okay? Constitution. Fifth Amendment.

" * * *

"UNIDENTIFIED SPEAKER: Did the, um, defendants plead the Fifth? They didn't want to talk.

"[PROSECUTOR]: I believe the Detective testified that they declined to even come in and have photos taken.

"UNIDENTIFIED SPEAKER: Did you say talk to you?

"THE WITNESS: I said that I asked them have their photos taken and they declined.

"UNIDENTIFIED SPEAKER: And you them?

"THE WITNESS: No.

"[PROSECUTOR]: Let me ask you this. they decline to come in and talk to you?

"THE WITNESS: Yes.

"[PROSECUTOR]: Based upon what he just told you, however, please, you cannot draw any negative inferences from that. They have a Fifth Amendment right not to talk. Okay? All right. Um, anybody else? Okay.

"(RECESS)

" * * *

"UNIDENTIFIED SPEAKER: Would any of the targets be willing to come in and talk to us?

"[PROSECUTOR]: Uh, we—we are not—if, in fact, a target wanted to, they would have already notified us. We are not allowed to contact targets, um, because, again, they are innocent until proven guilty. They have a right against self-incrimination.

"Quite frankly, generally speaking, targets do not come in and, generally speaking, it isn't appropriate for the targets to come in. I think the Judge actually talked about that the first day he was giving you instructions, as well. So, we cannot contact targets. So, and they would have contacted us already if that was something there [sic] were interested in doing."

This Court applies a harmless-error inquiry in reviewing a motion to dismiss an indictment.[7] *Franco*, 750 A.2d at 418. We have stated that "dismissal of an indictment is appropriate only 'if it is established that the violation substantially influenced the grand jury's decision to indict' or if there is 'grave doubt' that the decision to indict was free from substantial influence of such violations." *State v. Mainelli*, 543 A.2d 1311, 1314 (R.I.1988) (quoting *Bank of Nova Scotia v. United States*, 487 U.S. 250, 256, 108 S.Ct. 2369, 101 L.Ed.2d 228 (1988)); *see also Franco*, 750 A.2d at 418; *State v. Chiellini*, 557 A.2d 1195, 1199 (R.I.1989). We also have explained that "[t]he United States Supreme Court, as well as this court, has held that a trial on the merits renders harmless any defect that occurred in the grand jury process." *Mainelli*, 543 A.2d at 1313.

"[T]he petit jury's subsequent guilty verdict means not only that there was probable cause to believe that the defendants were guilty as charged, but also that they are in fact guilty as charged beyond a reasonable doubt. Measured by the petit jury's verdict, then, any error in the grand jury proceeding connected with the charging decision was harmless beyond a reasonable doubt." *State v. Woodson*, 551 A.2d 1187, 1191 (R.I.1988) (quoting *United States v. Mechanik*, 475 U.S. 66, 70, 106 S.Ct. 938, 89 L.Ed.2d 50 (1986)).

We also have said "the defendant's conviction by a petit jury completely unaffected by any of the irregularities raised by the defendant [during grand jury proceedings]

7. The United States Supreme Court explained that there are some circumstances that require automatic dismissal of an indictment, *e.g.*, racial discrimination in the selection of grand jurors. *United States v. Mechanik*, 475 U.S. 66, 70–71 n. 1, 106 S.Ct. 938, 89 L.Ed.2d 50 (1986); *see also Bank of Nova Scotia v. United States*, 487 U.S. 250, 257, 108 S.Ct. 2369, 101 L.Ed.2d 228 (1988) (noting that the exclusion of women from grand juries is not subject to harmless-error review).

would make the dismissal of this indictment wholly inappropriate." *State v. Mollicone*, 654 A.2d 311, 326–27 (R.I.1995).

■ We begin our analysis with salient observations about the traditional role of the grand jury and its relationship with the prosecutor. "We have long recognized that the powers of our state grand juries are those that were to be found at common law." *Guido*, 698 A.2d at 735. The grand jury envisioned by our Constitution is a common-law grand jury whose powers are broad and whose inquiries are not limited to matters presented by the prosecutor or the instructions of the court. *In re Buxton*, 111 R.I. at 482, 304 A.2d at 351–52. Under our common-law system, grand jurors can investigate and act upon such matters as might come before them either because of their observations or evidence presented to them. *Id.* at 482, 304 A.2d at 352. The investigating authority of the grand jury is broad. *Guido*, 698 A.2d at 735. Accordingly, "[t]he grand jury may compel the production of evidence or the testimony of witnesses as it considers appropriate, and its operation generally is unrestrained by the technical procedural and evidentiary rules governing the conduct of criminal trials." *Id.* (quoting *United States v. Calandra*, 414 U.S. 338, 343, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974)).

■ We have acknowledged that "in carrying out its unique investigative function, grand jury inquiries are often carried out with great assistance from and with interaction with the Office of the Attorney General and its police investigators." *Guido*, 698 A.2d at 736. "[I]t is equally well established that the Attorney General may, and in fact it is his duty to, attend on the grand jurors with matters on which they are to pass, aid in the examination of witnesses, and give such general instructions as they may require." *Id.* (quoting *State v. Edwards*, 89 R.I. 378, 386–87, 153 A.2d 153, 158–59 (1959)). "[The prosecutor] may, in practice, select the witnesses to be subpoenaed to appear before the grand jury and generally direct the investigation." *Id.* (quoting *In re Melvin*, 546 F.2d 1, 5 (1st Cir.1976)). However, while an intimate relationship may exist between the grand jury and the Office of the Attorney General, their powers are not coextensive. *Id.* It follows, therefore, "that a point may be reached at which the relationship between the prosecuting attorney and the grand jury may well become so intertwined that it may be said that the prosecuting attorney has improperly usurped the power of the grand jury." *Guido*, 698 A.2d at 736.

With these observations in mind, we look closely at Mr. Sidibe and Mr. Russell's allegation that the prosecutor interfered with the common-law investigatory functions of the grand jury by incorrectly stating that "we cannot contact targets" and that Mr. Russell and Mr. Sidibe "would have contacted us already" if they were interested in testifying before the grand jury. Although it is true that many allegations of prosecutorial misconduct are creative attempts to challenge the sufficiency and competence of the evidence before the grand jury, *see* Sara Sun Beale et al., 2 *Grand Jury Law and Practice*, § 9:1 at 9–4 (2d ed. 2005) ("Because [United States Supreme Court precedents] preclude any direct attack on the nature and sufficiency of the evidence presented to the grand jury, they promote reliance on different ways of formulating the same objections" such as prosecutorial misconduct), defendants' contention in this case is a bona fide prosecutorial misconduct argument.

■ This Court has "[g]enerally * * * subscribed to the principle articulated by the United States Supreme Court that '[a]n indictment returned by a legally con-

stituted and unbiased grand jury, like an information drawn by the prosecutor, if valid on its face, is enough to call for a trial of the charge on the merits.'" *Simpson*, 658 A.2d at 524 (quoting *Costello*, 350 U.S. at 363, 76 S.Ct. 406). As we have stated many times, the dismissal of an indictment because of prosecutorial misconduct is an extraordinary remedy. *E.g., Bustamante v. Wall*, 866 A.2d 516, 525 (R.I.2005); *Franco*, 750 A.2d at 419; *Simpson*, 658 A.2d at 524; *Mollicone*, 654 A.2d at 326; *Woodson*, 551 A.2d at 1190; *Mainelli*, 543 A.2d at 1313; *State v. Cassey*, 543 A.2d 670, 676 (R.I.1988); *State v. Manocchio*, 497 A.2d 1, 12 (R.I.1985); *State v. Romano*, 456 A.2d 746, 750 (R.I.1983). "The sanction sought is reserved for very limited and extreme circumstances," *Romano*, 456 A.2d at 750, because "[t]o dismiss an indictment because of [prosecutorial] misconduct means that even though a jury unanimously found a defendant guilty beyond a reasonable doubt, we would nevertheless void his conviction because the prosecution had made a misstep in obtaining a grand-jury determination of probable cause." *Id.* We further have expounded upon this standard, explaining that "dismissal should be reserved 'to situations in which there has been flagrant prosecutorial misconduct accompanied by severe and incurable prejudice.'" *Franco*, 750 A.2d at 419 (quoting *DiPrete*, 710 A.2d at 1276).

Applying these principles to the facts of this case, we conclude that the prosecutor's alleged misstatements to the grand jury did not amount to flagrant prosecutorial misconduct accompanied by severe and incurable prejudice. Several of our previous prosecutorial-misconduct cases are helpful in reaching this conclusion. In *Tempest*, 660 A.2d at 280, the defendant moved for dismissal of the indictment based on numerous allegations of prosecutorial misconduct, including allegations that the prosecutor informed the grand jury that there had been more than twenty previous grand juries related to the matter, that the defendant was under suspicion by the police, and that the defendant previously had been indicted for perjury in relation to the case. We held that the extraordinary sanction of dismissal of the indictment was not warranted. *Id.*

Similarly, in *Chiellini*, 557 A.2d at 1199, the defendant alleged that the prosecutor, through a detective's testimony, misled the grand jury by exaggerating and fabricating evidence. The *Chiellini* defendant alleged that the detective misled the grand jury by reading the police statement of the defendant's father-in-law that said the defendant raped and beat other women, asserting that a penknife in the defendant's home could have inflicted the murder wounds, and alluding repeatedly to the possibility that the defendant raped the victim before murdering her. *Id.* at 1200. We found that any impropriety before the grand jury was harmless beyond a reasonable doubt, reasoning that the petit jury found the defendant guilty without the alleged false and misleading evidence presented to the grand jury, and with substantially similar circumstantial evidence available for its consideration. *Id.* at 1201.

Finally, in *Franco*, 750 A.2d at 418, the defendant alleged, among other things, that the presentation of taped evidence precluded the grand jurors from making inquiries of witnesses, and that the prosecutor, without legal authority, told the grand jury that it would require a vote of twelve jurors to hear live witnesses. We reasoned that the playing of the tapes did not constitute reversible error, because "our review of the proceedings disclosed that none of the grand jurors was prevented from asking questions." *Id.* This Court also held that the prosecutor's offer to bring in live witnesses upon a vote of

twelve grand jurors was not egregious misconduct. *Id.* at 419.

Mr. Sidibe and Mr. Russell contend that the grand jury drew adverse inferences from the prosecutor's statements and that the grand jury would not have found probable cause to indict if it heard their version of events. With respect to defendants' argument that the prosecutor improperly commented on their right against self-incrimination, our review of the transcript indicates that the prosecutor mentioned the Fifth Amendment in the context of her suggestion that defendants "decline[d] to come in and talk to [the Detective]." The prosecutor also pointed out that "you cannot draw any inferences one way or another from that." It is our opinion that the alleged prosecutorial misconduct in *Tempest* and *Chiellini* potentially was more prejudicial than the prosecutor's statements here, and yet in those cases we still found the alleged error harmless beyond a reasonable doubt.

The prosecutor's statement that "we cannot contact targets" is more troublesome because it suggests that grand jurors may have been precluded from asking questions, as discussed in *Franco,* or that the grand jury was prevented from performing its common-law investigatory functions. We decline to reverse on this ground, however, because the quantum of proof required at the grand jury stage is much lower than at the petit-jury stage. *See Chiellini,* 557 A.2d at 1201 ("A grand jury needs only probable cause to indict."); *Romano,* 456 A.2d at 750. Mr. Benton testified before the grand jury and said that the three men all denied raping Barbara. Mr. Russell and Mr. Sidibe testified at trial and challenged Barbara's allegation of nonconsensual sex. We find it illogical to suggest that defendants suffered severe and incurable prejudice at the hands of the prosecutor in front of the grand jury when the petit jury heard the contested information directly from defendants and still found them guilty beyond a reasonable doubt. *Cf. Chiellini,* 557 A.2d at 1201 (petit jury convicted on substantially similar evidence except without the false and misleading evidence that was before the grand jury).

The petit jury's determination of guilt beyond a reasonable doubt in this case leads ineluctably to the conclusion that the grand jury's indictment was valid on its face and enough to call for a trial on the merits. *See Simpson,* 658 A.2d at 524. The substance of defendants' testimony at trial and their subsequent convictions demonstrate that the alleged prosecutorial misstatements did not substantially influence the grand jury's decision to indict or establish grave doubt that the decision to indict was free from substantial influence of such violations. We are satisfied, therefore, that the alleged prosecutorial misconduct before the grand jury was rendered harmless beyond a reasonable doubt.

## C

### The Right to Counsel at Grand Jury Proceedings

■ Mr. Russell and Mr. Sidibe's third argument alleges that they were denied the right to be represented by counsel at a critical stage of the prosecution. The defendants point to the Sixth and Fourteenth Amendments to the United States Constitution, and article 1, section 10, of the Rhode Island Constitution, as the sources for the right to counsel during grand jury proceedings. They also contend that their rights "to due process and equal protection under both the U.S. constitution and R.I. constitution have been violated."

■ The state asserts that defendants waived the issue by failing to raise it before the Superior Court. We agree. As

a general matter, this Court's "raise-or-waive" rule precludes our consideration of an argument "that has not been raised and articulated at trial." *State v. Bido,* 941 A.2d 822, 828 (R.I.2008). "It is well settled that a litigant cannot raise an objection or advance a new theory on appeal if it was not raised before the trial court." *Id.* at 828–29. Further, "[o]ur cases indicate that the moving party at the trial court level must articulate the motion in an understandable manner for the trial justice." *Id.* at 829.

Mr. Sidibe and Mr. Russell's "Motion to Dismiss the Indictment Because of the Failure to Present Exculpatory Evidence To and Other Irregularities Occurring Before the Grand Jury" did not mention the right-to-counsel argument. Neither did a similar motion that Mr. Delvalle filed. Instead, Mr. Sidibe and Mr. Russell assert that the right-to-counsel issue was raised during the subsequent motion hearing by Mr. Delvalle's attorney when he commented on the role of the public defender.[8] Mr. Delvalle's attorney said:

"What's really troubling here, Judge, is this. As you know, my client, Onix Delvalle, is represented by the public defender. The other two co-defendants are represented by private counsel. They had the financing, wherewithal, to afford attorneys to represent them in this matter, but my client did not have the benefit of counsel at the time that this case was considered by the grand jury. And so I would suggest that he could not be in a position to say, even if the grand jury chose to hear him, I'm not in a position to say—he is not in a position to say, well, I will go in or I

want to go into the grand jury. That seems to be kind of what the State is trying to say here. Well, they had the chance to go in and they didn't go in. It would have been appropriate, as I have indicated, perhaps for the prosecutor to seek the intercession of the court in order to see what should be done here." [9]

Mr. Sidibe and Mr. Russell also allege that the Superior Court ruled on their right-to-counsel argument in its written opinion on the motion to dismiss. They point to the last paragraph of the court's eight-page discussion on exculpatory evidence and grand juries, in which the hearing justice said:

"This Court makes this decision in accordance with recent precedent and with due deference to the doctrine of *stare decisis.* This Court is mindful, however, that the current status of the law works to the disadvantage of indigent defendants, as in the present matter, who lack the resources to obtain counsel immediately to guide them through the grand jury process."

Mr. Russell and Mr. Sidibe argue that the "specific arguments of equal protection, the right to assistance of counsel and due process are an expansion of the argument presented and articulated in the lower court," and that they should be permitted to expand on such issues before this Court.

It is clear to this Court that defendants' oral argument before the hearing justice focused on the duties and role of the prosecutor in grand jury proceedings. Our review of the Superior Court record reveals that the comments about the public

8. At the end of the motion hearing, an attorney appearing on behalf of Mr. Sidibe and Mr. Russell concurred with the motion to dismiss.

9. According to Mr. Russell, the Superior Court appointed private counsel to represent him to avoid a conflict of interest because he was indigent and the public defender already represented Mr. Delvalle.

defender were made in the context of defendants' argument that the prosecutor prevented the grand jury from performing its common-law functions. During that discussion, Mr. Delvalle's attorney simply said, and the hearing justice agreed, that indigent defendants are at a disadvantage before the grand jury. A review of the record, however, fails to reveal any argument or statement that this disadvantage contravenes the United States or Rhode Island Constitutions. Neither do we discern that Mr. Delvalle's attorney made a stand-alone argument about the denial of the right to counsel during grand jury proceedings.

The oral argument at the motion hearing did not make clear in a rational and recognizable posture that defendants' alleged right to counsel was violated during grand jury proceedings. *See Bido*, 941 A.2d at 829 ("If defendant intended to make a motion to dismiss for lack of a speedy trial, he did not put forth his argument in a rational and recognizable posture to the trial justice."). We are of the opinion, therefore, that Mr. Sidibe and Mr. Russell's contention that they were denied their right to be represented by counsel at a critical stage of the prosecution was not preserved for appellate review.

**D**

**The Motion for a New Trial**

█ In the final issue before this Court, Mr. Sidibe contends that the trial justice erred in denying his motion for a new trial. According to Mr. Sidibe, the Superior Court "failed to take account of the great weight of the reliable and probative evidence including circumstantial evidence, which strongly established that what occurred between the parties were instances of consensual [sex]." Specifically, Mr. Sidibe alleges that the trial justice did not fully consider his defense of consent

and did not subject Barbara's testimony to any meaningful scrutiny. Mr. Sidibe asserts that the trial testimony established that Barbara had many opportunities to leave the three men or telephone for help. If the sexual acts were nonconsensual, Mr. Sidibe also contends, Barbara would not have entered Mr. Russell's apartment and remained there before the incident occurred.

█ When ruling on a motion for a new trial, "the trial justice acts as a thirteenth juror and exercises independent judgment on the credibility of witnesses and on the weight of the evidence." *State v. Bergevine*, 942 A.2d 974, 981 (R.I.2008) (quoting *State v. Gomez*, 848 A.2d 221, 234 (R.I.2004)). "In fulfilling this role, the trial justice must (1) consider the evidence in light of the jury charge, (2) independently assess the credibility of the witnesses and the weight of the evidence, and then (3) determine whether he or she would have reached a result different from that reached by the jury." *State v. Schloesser*, 940 A.2d 637, 639 (R.I.2007) (quoting *State v. Morales*, 895 A.2d 114, 121 (R.I.2006)). "If, after conducting this independent review, the trial justice agrees with the jury's verdict or if the evidence is such that reasonable minds could differ as to the outcome, the motion for a new trial should be denied." *Bergevine*, 942 A.2d at 981 (quoting *Gomez*, 848 A.2d at 234). "If, however, 'the trial justice finds that the state has failed to sustain its burden of proof, a new trial must be ordered.'" *Id.*

█ This Court affords substantial deference to the ruling of a trial justice on a motion for a new trial. *Schloesser*, 940 A.2d at 639. "Provided that the trial justice has 'articulated an adequate rationale for denying a motion,' a trial justice's ruling on a new trial motion is entitled to great weight." *Id.* (quoting *State v.*

*Lynch,* 854 A.2d 1022, 1046 (R.I.2004)). "[T]he trial justice need not refer to all the evidence supporting the decision but need only cite evidence sufficient to allow this court to discern whether the justice has applied the appropriate standards." *Gomez,* 848 A.2d at 234 (quoting *State v. Otero,* 788 A.2d 469, 472 (R.I.2002)). "A trial justice's ruling on a new-trial motion will not be overturned unless the trial justice was clearly wrong or unless he or she overlooked or misconceived material and relevant evidence that related to a critical issue in the case." *Schloesser,* 940 A.2d at 639 (quoting *Lynch,* 854 A.2d at 1046).

In exercising our appellate role, we carefully have examined the trial justice's ruling and are well satisfied that he performed his duties appropriately. The trial justice reviewed the evidence presented and commented that the case "in virtually all respects * * * rested on the jury's assessment of the credibility of the witnesses." The Superior Court was impressed by Barbara's testimony, and determined that it was "straightforward, unvarnished and unembellished." The trial justice explained that Barbara's testimony "was, in a word, credible, and the jury was well-warranted in accepting it."

The Superior Court also evaluated defendants' testimony and found that they "did not present themselves as particularly credible witnesses." In particular, the trial justice reasoned that defendants' version of events did not make "credible sense, and the jury was well justified in rejecting [their story]." The trial justice explained that it was unlikely that Barbara offered herself to all three men, after which defendants made stops in the car and, upon arriving at the apartment, left Barbara "in the living room, as if she was some sort of patient in a doctor's waiting room waiting for her name to be called."

The Superior Court also doubted defendants' contention that Mr. Sidibe sat on a separate bed viewing photos from his prom and from a trip, "ignoring what [Mr.] Russell was doing to [Barbara] a few feet away from him on the other bed."

The trial justice was equally unimpressed with the other witnesses who supported defendants' version of events. The Superior Court found that the testimony offered by Mr. Russell's sister "was stiff and well-rehearsed and was not compelling in the least bit." With respect to Mr. Benton, the trial justice determined that he "did not add all that much to the case, save to impress this Court with a self-serving interest and, as well, an undisguised interest in trying to assist these defendants."

The foregoing discussion demonstrates that the trial justice sufficiently considered the defendants' defense of consensual sex. The Superior Court reviewed the defendants' version of events and found that the jury was warranted in rejecting their testimony. We are satisfied the trial justice did not overlook or misconceive material evidence in finding that the defendants committed first-degree sexual assault. The Superior Court articulated an adequate rationale for denying the motion for a new trial. Affording the trial justice's findings the great weight to which they are entitled, we cannot say he clearly was wrong.

## III

### Conclusion

For the reasons stated in this opinion, we affirm the judgments of the Superior Court and remand the record in this case thereto.